**MICRON TECHNOLOGY, INC.,**
Plaintiff–Appellant,

v.

The **UNITED STATES**, Defendant–
Appellee,

and

**Hyundai Electronics Industries Co., Ltd. and Hyundai Electronics America, Inc., Defendants–Appellees,**

and

**LG Semicon Co., Ltd., and LG Semicon America, Inc., Defendants–Appellees,**

and

**Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc., Defendants.**

No. 96–1181.

United States Court of Appeals,
Federal Circuit.

June 30, 1997.

Gilbert B. Kaplan, Hale and Dorr, Washington, DC, argued, for plaintiff-appellant. Of counsel on the brief were Paul W. Jameson, Cris R. Revaz, and John M. Ryan.

Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued, for defendant-appellee the United States. With her on the brief were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director. Of counsel on the brief were Stephen J. Powell, Chief Counsel for Import Administration, U.S. Department of Commerce, Berniece A. Browne, Senior Counsel, and Patrick V. Gallagher, Attorney–Advisor.

Lawrence R. Walters, Graham & James, L.L.P., Washington, DC, argued, for defendants-appellees Hyundai Electronics Industries Co., Ltd., and Hyundai Electronics America, Inc. Of counsel was Andrea Fekkes Dynes.

Raymond Paretzky, Kaye, Scholer, Fierman, Hays & Handler, L.L.P., Washington, DC, argued, for defendants-appellees LG Semicon Co., Ltd. and LG Semicon America, Inc. With him on the brief was Michael P. House.

Before PLAGER, RADER, and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

This is an antidumping case. Micron Technology, Inc. ("Micron") appeals from the June 12, 1995 decision of the United States Court of International Trade in favor of the United States, Hyundai Electronics Industries Co., Ltd. and Hyundai Electronics America, Inc. (collectively "Hyundai"), and LG Semicon Co., Ltd. and LG Semicon America, Inc. (collectively "LG Semicon") in *Micron Technology, Inc. v. United States*, 893 F.Supp. 21 (Ct. Int'l Trade 1995). The court's decision affirmed aspects of the final determination of the United States Department of Commerce, International Trade Administration ("Commerce" or "ITA"), as issued and amended, that Korean dynamic random access memory semiconductors ("DRAMs") of one megabit and above were being sold in the United States at less than fair value ("LTFV"). *Final Determination of Sales at Less than Fair Value*, 58 Fed. Reg. 15,467 (Mar. 23, 1993) ("Final LTFV Determination"); *Antidumping Duty Order and Amended Final Determination*, 58 Fed. Reg. 27,520 (May 10, 1993) ("Amended Final LTFV Determination"). The determination resulted in the imposition of an antidumping duty order with respect to Hyundai and LG Semicon. Micron contends that in the process of calculating the antidumping duty, Commerce failed to verify properly Hyundai Electronics Industries Co., Ltd.'s ("HEI")

and LG Semicon Co., Ltd.'s ("LGS") costs of production. We affirm.

## BACKGROUND

Under the statutory provision governing the imposition of antidumping duties, additional duties are imposed on imported merchandise that is being sold, or that is likely to be sold, in the United States at less than fair value to the detriment of a domestic industry. 19 U.S.C. § 1673 (1988).[1] A duty, otherwise known as the "dumping margin," is imposed that is equal to the "amount by which the foreign market value exceeds the United States price for the merchandise." *Id.*

Antidumping proceedings normally are commenced when an "interested party" files a petition with Commerce and simultaneously files a copy of the petition with the International Trade Commission ("ITC"). 19 U.S.C. § 1673a(b). In the petition, the interested party must allege the elements necessary for the imposition of an antidumping duty pursuant to 19 U.S.C. § 1673.

On April 22, 1992, Micron filed a petition with Commerce, alleging that Korean DRAMs of one megabit and above were being sold in the United States at less than fair value and were being sold in the home market at less than the cost of production. Micron also alleged that an industry in the United States was being materially injured, or threatened with material injury. *See Initiation of Antidumping Duty Investigation: Dynamic Random Access Memory Semiconductors of One Megabit and Above from the Republic of Korea*, 57 Fed.Reg. 21,231 (May 19, 1992). In response, Commerce investigated Korean DRAM sales for the period of investigation running from November 1, 1991, through April 30, 1992. 58 Fed.Reg. at 15,467–15,468.

Following an affirmative preliminary injury determination by the ITC,[2] *see Dynamic Random Access Memories of One Megabit and Above From the Republic of Korea*, 57 Fed.Reg. 27,063 (June 17, 1992), Commerce served questionnaires on HEI and LGS,[3] soliciting financial information pertinent to the sales at less than fair value investigation.[4] The questionnaires covered a broad spectrum of financial information, including cost of production data. After analyzing initial and supplemental questionnaire responses, Commerce made a preliminary affirmative determination of sales at less than fair value. In so doing, it relied on HEI's submitted cost of production information but rejected some of LGS's submitted information in favor of the best information available. *Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Dynamic Random Access Memory Semiconductors of One Megabit and Above From the Republic of Korea*, 57 Fed.Reg. 49,066 (Oct. 29, 1992).

Shortly after the preliminary determination, Commerce personnel traveled to Korea to verify the responses received from the investigated parties. In Korea, Commerce conducted a six-day verification study at HEI's production facility and head office.

1. Effective January 1, 1995, the Uruguay Round Agreements Act ("URAA"), Pub.L. No. 103–465, 108 Stat. 4809, amended the antidumping laws in a number of respects. The URAA does not apply to antidumping investigations, such as the one in this case, that were initiated before January 1, 1995. Citations are to the antidumping laws before these amendments. In the interest of clarity, we use the present tense when discussing statutory provisions. Unless otherwise indicated, all references are to the 1988 version of the United States Code.

2. Unless Commerce dismisses an interested party's petition because it does not meet the requirements of 19 U.S.C. § 1673, the ITC has the responsibility of making a preliminary determination as to whether a domestic industry has been injured by "reason of imports of the merchandise which is the subject of the investigation by [Commerce]." 19 U.S.C. § 1673b(a).

3. During the period of investigation, LGS was known as Goldstar Electron Co., Ltd. ("Goldstar"). Commerce also investigated Samsung Electronics Co., Ltd. and Samsung Semiconductor, Inc. (collectively "Samsung"). Samsung has not participated in this appeal.

4. Following an affirmative preliminary injury determination by the ITC, pursuant to 19 U.S.C. § 1673b(a), Commerce is charged with determining "whether there is a reasonable basis to believe ... that the merchandise is being sold, or is likely to be sold, at less than fair value." 19 U.S.C. § 1673b(b)(1).

Commerce also spent six days conducting a verification study at LGS's facilities in Korea.

On January 11, 1993, Commerce issued its verification reports, entitled "Verification of Cost of Production: Hyundai Electronics Industries Co., Ltd." and "Verification of Cost of Production and Constructed Value: Goldstar Electron Co., Ltd." On February 2 and 3, 1993, after completing the verification process, Commerce held public hearings to address various verification issues. On March 23, 1993, Commerce, relying on the questionnaire responses submitted by HEI and LGS, published the Final LTFV Determination pursuant to 19 U.S.C. § 1673d(a)(1). In the Final LTFV Determination, Commerce determined that Korean DRAMs of one megabit and above were being sold in the United States at less than fair value. 58 Fed.Reg. at 15,481. Commerce also computed the relevant dumping margins, expressed in percentages, as follows:

| | |
|---|---|
| Goldstar(LGS) | 4.97 |
| HEI | 7.19 |
| All others [5] | 3.19 |

*Id.*

Following a final affirmative injury determination by the ITC, Commerce issued the Amended Final LTFV Determination on May 10, 1993. 58 Fed.Reg. at 27,520.[6] In so doing, Commerce corrected certain errors in the Final LTFV Determination and recomputed the dumping margins to be:

| | |
|---|---|
| Goldstar(LGS) | 4.97 |
| HEI | 11.16 |
| All others | 3.85 |

*Id.* at 27,522. These recomputed antidumping duties were assessed on "all unliquidated entries of dynamic [RAM] semiconductors of one megabit and above from the Republic of Korea entered, or withdrawn from warehouse, for consumption on or before October 29, 1992, the date on which the Department published its preliminary determination no-

tice in the Federal Register...." *Id.* The dumping margins also applied as the cash deposit rates for entries occurring after October 29, 1992.

On June 8, 1993, Micron appealed to the Court of International Trade, challenging various aspects of Commerce's Final Amended LTFV Determination, as issued and amended.[7] *Micron,* 893 F.Supp. at 26. Hyundai, LG Semicon, and Samsung intervened as defendants. On June 12, 1995, the court issued a decision sustaining Commerce's determination in part and remanding in part with respect to issues not relevant here. *Id.* at 42–43. Of relevance to this appeal is the court's holding that Commerce applied a reasonable verification standard and that substantial evidence supports Commerce's verification results leading to the Final Amended LTFV Determination. *Id.* at 42.

In due course, Commerce filed its remand determination. After finding the remand determination to be in compliance with its prior decision, the Court of International Trade entered final judgment. Micron now appeals the Court of International Trade's June 12, 1995 decision. Specifically, it contests the court's determination that the test Commerce employed during verification was reasonable and was a permissible exercise of judgment. It also challenges the court's findings that substantial evidence supports Commerce's reliance on HEI's and LGS's cost of production data.

## DISCUSSION

### I.

■ We have exclusive jurisdiction over an appeal from a final decision of the Court of International Trade. 28 U.S.C. § 1295(a)(5) (1994). Before turning to the

---

5. The "all others" cash deposit rate applies to companies not investigated in the LTFV investigation. *See Federal–Mogul Corp. v. United States,* 822 F.Supp. 782, 784 (Ct. Int'l Trade 1993) (noting that "companies which were not investigated in the LTFV investigation ... received the LTFV 'all others' cash deposit rate").

6. If Commerce's final LTFV determination is affirmative, the ITC makes a final determination as

to material injury. *See* 19 U.S.C. § 1673d(b)(1). If the ITC's determination is affirmative, Commerce issues a final antidumping duty order. *See* 19 U.S.C. §§ 1673d(c)(2), 1673e(a).

7. Review of a final LTFV determination by Commerce is available in the Court of International Trade pursuant to 19 U.S.C. § 1516a(a)(2).

merits, however, we must address a jurisdictional issue raised by Hyundai and LG Semicon. The antidumping law provides for periodic review of antidumping duties. *See* 19 U.S.C. § 1675(a) (1994). On May 6, 1996, Commerce issued final results of the first administrative review in this case, computing, for the period running from October 29, 1992 through April 30, 1994, a 0.06 percent dumping margin for Hyundai and a zero percent dumping margin for LG Semicon. *Dynamic Random Access Memory Semiconductors of One Megabit or [sic] Above from the Republic of Korea; Final Results of Antidumping Duty Administrative Review* ("Final Results of the First Administrative Review"), 61 Fed. Reg. 20,216, 20,222 (May 6, 1996).

Hyundai and LG Semicon, recognizing that a controversy "must exist at stages of appellate or certiorari review, and not simply at the date the action is initiated," *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973), contend that jurisdiction is defeated here because there no longer exists a case or controversy as required by Article III of the Constitution. U.S. Const. art. III, § 2. More particularly, Hyundai and LG Semicon submit that Commerce's publication of the Final Results of the First Administrative Review, in which the dumping margins found in the original antidumping investigation were modified, renders this case moot. This is so, they argue, because a revision of the original dumping margins computed as part of the Final Amended LTFV Determination, which is what Micron is seeking, will not affect the parties to this case.[8] Micron responds that the case is not moot.

Antidumping duties are computed through a series of reviews. As seen above, Commerce initially determines whether articles are being sold at less than fair value during the preliminary LTFV determination. That determination takes place within 160 days after the filing of the petition that commences the antidumping proceeding. 19 U.S.C. § 1673b(b)(1). Within 75 days after the preliminary LTFV determination, Commerce makes a final LTFV determination, determining whether the imported merchandise is being, or is likely to be, sold at less than fair value. *Id.* § 1673d(a)(1). Within approximately 45 days of the final LTFV determination, the ITC makes a final injury determination, *id.* § 1673d(b)(2)(B), and if such determination is in the affirmative, Commerce issues an antidumping duty order. *Id.* § 1673d(c)(2). The dumping margin resulting from the antidumping investigation establishes the amount of the deposit of estimated duties for entries of covered merchandise up to the date of publication of the final results of the first administrative review. *Id.* § 1673e. Upon the first anniversary of the publication of the antidumping duty order or upon completion of the first administrative review, if requested by an interested party, duties are assessed and existing entries are liquidated. 19 C.F.R. § 353.22 (1996). Liquidation of new entries is suspended for each one-year period. *Id.* Upon each anniversary of the antidumping duty order, dumping margins may be reassessed through an administrative review if a request is made by an interested party. 19 U.S.C. § 1675(a) (1994). As recognized by the Court of International Trade, administrative review results "serve as the basis for actual duty assessment with regard to the entries covered by the particular determination and as the basis for cash deposits of estimated duties for future entries." *Silver Reed Am., Inc. v. United States,* 9 CIT 221, 224 (1985). Thus, at the end of each one-year period the prior entries are liquidated in accordance with the original dumping margins unless a review has been requested, in which case they are liquidated at the new margins.[9]

The thrust of Hyundai's and LG Semicon's mootness argument is that the Final Results of the First Administrative Review, which is not at issue in this appeal, established the

8. Except insofar as it pertains to the mootness question, the First Administrative Review is not at issue in this case.

9. Determination of new margins results in the return of excess deposited duties if the administrative review results in a lower dumping margin for the period which is reviewed. However, the payment of additional duties is not required if the administrative review results in a higher dumping margin for the period that is reviewed. 19 U.S.C. § 1673f(a).

amount of antidumping duties actually to be assessed on imports of subject merchandise produced and entered during the review period. In the Final Results of the First Administrative Review, Commerce also revised the cash deposit rate for estimated antidumping duties on merchandise imported in the future by Hyundai and LG Semicon. Consequently, Hyundai and LG Semicon note, the margins of 11.16 percent and 4.97 percent that were determined for HEI and LGS, respectively, in the Amended Final LTFV determination are no longer of any force or effect.

Micron does not dispute the fact that, as a result of the first administrative review, there now is no time period for which the dumping margins calculated for HEI and LGS in the Amended Final LTFV Determination apply. *Cf. Zenith Radio Corp. v. United States,* 710 F.2d 806, 808 (Fed.Cir. 1983) ("The next published section 751 review will abrogate the effect of the challenged determination on deposit amounts by establishing the margin to be used for assessment of actual antidumping duties on entries after March 31, 1980, and for estimating deposit amounts on subsequent entries.") Micron contends, however, that a ruling in its favor would affect the "all others" rate—the dumping rate applied to companies not subject to a separate dumping determination— that was computed as part of the Amended Final LTFV Determination. *Cf. id.* at 810 ("Even though the '79–'80 imported articles have already been sold and the increased duties (if Zenith ultimately prevails) will go to the government, not Zenith, Zenith still has a strong, continuing, commercial-competitive stake in assuring that its competing importers will not escape the monetary sanctions deliberately imposed by Congress. Defeat of that strong congressionally recognized competitive interest and the abrogation of effective judicial review are sufficient irreparable injury here."). We find Micron's argument persuasive.

The "all others" rate is generally computed, and Micron contends was computed in the case at bar, by taking a weighted average of the separate dumping margins. *See* Raj Bhala, *Rethinking Antidumping Law,* 29 Geo. Wash. J. Int'l L. & Econ. 1, 144 (1995)

(noting that the "all others" rate is "[g]enerally ... based on a weighted average of individual dumping margins calculated for those exporters that are individually investigated"). Therefore, the "all others" rate calculated during the Amended Final LTFV Determination was a product of HEI's and LGS's costs of production. It is true that HEI's and LGS's initial dumping rates were subsequently revised during the first administrative review and thereafter no longer applied as the cash deposit rate. *See* 61 Fed. Reg. 20,216. However, the "all others" rate remained intact because, as recognized in *Federal–Mogul Corp. v. United States,* 822 F.Supp. 782, 788 (1993), the "all others" rate is not revised when the dumping margins used to compute the rate have been successfully challenged through an administrative review requested by an entity subject to a separate dumping rate. In the absence of an administrative review of the "all others" rate on the first anniversary of the Amended Final LTFV Determination, the original "all others" rate remained in effect as the cash deposit rate and as the assessment rate for the period of October 29, 1992 (the date of liquidation suspension) through April 30, 1994. *See* 19 U.S.C. § 1675(a); 19 C.F.R. § 353.22(e)(1) (1996) ("[I]f the Secretary does not receive a timely request ..., the Secretary, without additional notice, will instruct the Customs Service to assess antidumping duties ... at rates equal to the cash deposit of, or bond for, estimated antidumping duties required on that merchandise at the time of entry, or withdrawal from warehouse, for consumption and to continue to collect the cash deposits previously ordered."). The "all others" rate survived the first administrative review of HEI's and LGS's dumping margins. In addition, the "all others" rate is properly challenged on appeal by virtue of the fact that it was derived in part from HEI's and LGS's submitted cost of production information. Before the Court of International Trade, Micron challenged the adequacy of that information. Consequently, we find this case very much alive.

II.

A.

 In accordance with *Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556 (Fed.

Cir.1984), we apply anew to Commerce's factual determinations the standard of review applied by the Court of International Trade. *Id.* at 1559 n. 10 ("We review the [Court of International Trade's] review of an ITC determination by applying anew the statute's [19 U.S.C. § 1516a(b)(1)(B)(i) ] express judicial review standard."). In doing so, we uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). "Substantial evidence" has been defined as "more than a mere scintilla," as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). To determine if substantial evidence exists, we review the record as a whole, including all evidence that "fairly detracts from the substantiality of the evidence." *Atlantic Sugar*, 744 F.2d at 1562.

Micron's challenge to the Amended Final LTFV Determination is based on its assertion that Commerce did not properly verify HEI's and LGS' costs of production. Micron submits that HEI's and LGS's verification responses must be traceable from the responses they submitted to Commerce's questionnaires through to each company's financial statements and that, for this court to uphold the verification process, the trace must be supported by substantial evidence on the record. Thus, in articulating the verification requirement, Micron states that

> [w]hat is required is that for whatever sample numbers in the cost response that Commerce selects to trace, ... there be a complete, unbroken chain of data that links the cost response numbers to the financial statements in a way that can satisfy Commerce (and reviewing courts) that all costs have been accounted for, and that the costs have been reasonably allocated to the mer-

chandise that is the subject of the investigation.[10]

Micron contends that the record in this case does not support a conclusion that, in the course of the verification process, Commerce successfully performed the required traces with respect to crucial cost data and that therefore Commerce should not have relied upon the cost of production information submitted by HEI and LGS, but should have resorted to the best information available. Micron stresses its contention that the results of the verification process must be *on the record* for the verification to be considered supported by substantial evidence.

### B.

As already seen, if the ITC finds that dumping is occurring to the detriment of a domestic industry, Commerce is required to impose antidumping duties on the imported merchandise. 19 U.S.C. § 1673. An antidumping duty represents "the amount by which the foreign market value [FMV] exceeds the United States price [USP] for the merchandise." *Id.*[11] The statute requires Commerce to impose antidumping duties if it is determined, during an antidumping investigation, that:

> foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value [or foreign market value],[12] and ...
>
> (A) an industry in the United States—
>
> (i) is materially injured, or
>
> (ii) is threatened with material injury
> ...
>
> by reason of imports of that merchandise....

*Id.*

Micron does not dispute Commerce's finding of sales at less than fair value or the ITC's injury determination, both made during the investigative stage. Instead, it argues that there were deficiencies in the cost of produc-

---

10. Micron contends that a foreign producer's tendency to shift costs away from merchandise that is the subject of an antidumping investigation makes it imperative that the claimed production costs be traced back to the company's audited financial statements, because those statements are the best source of *all* of the company's costs.

11. This relationship can be expressed mathematically as: Dumping Margin = FMV − USP. *See* 19 C.F.R. § 353.2.

12. "Fair value" is defined, by regulation, as "an estimate of foreign market value." 19 C.F.R. § 353.42 (1996).

tion information upon which Commerce relied in computing FMV. FMV is generally the price at which the exporter sells the subject merchandise in its home market or to third countries other than the United States. *Id.* § 1677b(a)(1). In the case at bar, FMV was calculated on the basis of the constructed value of the merchandise. *See id.* § 1677b(a)(2).[13] Constructed value is determined by adding profit to the cost of production. *See id.* § 1677b(e) (defining constructed value). Thus, the dumping margins in this case were computed using the following mathematical equation:

Dumping Margin = (Cost of Production + Profit) − USP.

Because the constructed value was used as a surrogate for FMV in Commerce's calculations, Hyundai's and LG Semicon's dumping margins, and consequently the "all others" margin, were derived in part from HEI's and LGS's costs of production.

Commerce's reliance upon HEI's and LGS's submitted costs of production was proper only if Commerce was able to verify successfully the submitted information. Section 1677e(b) of Title 19 of the United States Code provides, in pertinent part, as follows:

The administering authority [Commerce] shall verify all information relied upon in making—

(1) a final determination in an investigation. . . .

In publishing notice of any action referred to in paragraph (1), . . . the administering authority shall report the methods and procedures used to verify such information. If the administering authority is unable to verify the accuracy of the information submitted, it shall use the best information available to it as the basis for its action, which may include, in actions referred to in paragraph (1), the information submitted in support of the petition.

19 U.S.C. § 1677e(b).

### C.

■ Before reaching the question of whether Commerce's verification is supported by substantial evidence, we must determine whether Commerce reasonably applied the verification requirement imposed by section 1677e(b). That means we must review the verification process employed by Commerce and the results obtained therefrom. Briefly, the verification process in this case essentially consisted of reviewing financial information, gaining an understanding of computational methodologies, testing the mathematical accuracy of submissions, and tracing, on a test basis, submissions to company financial records.

Although it is clear that Commerce's reliance on the cost of production submissions was only proper if the information was verified, Congress has not further defined what successful verification under section 1677e(b) entails. Because the term "verification" itself is latently ambiguous, we turn for guidance to the Supreme Court's decision in *Chevron, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Chevron* holds that when, as here, a court does not find that "Congress has directly spoken to the precise question at issue" or that "the intent of Congress is clear," *id.* at 842–43, 104 S.Ct. at 2781, but does find that "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782 (footnote omitted); *see also Arbor Foods Inc. v. United States,* 97 F.3d 534, 538 (Fed.Cir.1996) (articulating the *Chevron* standard). In antidumping cases, we acknowledge Commerce's special expertise and accord substantial deference to its construction of pertinent statutes. *See Torrington Co. v. United States,* 68 F.3d 1347, 1351 (Fed.Cir.1995) ("In antidumping cases, we accord substantial deference to Commerce's statutory interpretation, as the International Trade Administration is the 'master' of the antidumping laws."). We also recognize that Commerce is afforded broad

---

**13.** Section 1677b(a)(2) sets forth the circumstances under which FMV may be the constructed value of the merchandise. None of the parties contend that it was not proper to seek to use constructive value in this case.

discretion with regard to the conduct of investigations. Commerce has "the discretionary authority to determine the extent of investigation and information it needs." *PPG Indus., Inc. v. United States,* 978 F.2d 1232, 1238 (Fed.Cir.1992).

We note first that Commerce has not formally defined verification requirements. The regulation implementing section 1677e(b) does not specify any methods, procedures, or standards for verification. It simply provides that:

> *Procedures for verification.* In verifying under this section, the Secretary will notify the government of the foreign country in which verification takes place that employees of the Department will visit with producers or resellers in order to verify the accuracy and completeness of submitted factual information. As part of the verification, employees of the Department will request access to all files, records, and personnel of the producers, resellers, importers, or unrelated purchasers which the Secretary considers relevant to factual information submitted.

19 C.F.R. § 353.36(c) (1996).

Recognizing the general nature of the regulation, Micron asks us to turn to the following sources to discern Commerce's administrative practice in this area:

1. *Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany,* 56 Fed.Reg. 31,692, 31,707 (Issues Appendix) (July 11, 1991) ("AFB").

2. Marie Parker and Lawrence Bogard, *Verification, in The Commerce Department Speaks on Import Administration and Export Administration* Vol. 1., at 163–80 (1984).

In AFB, which is a report of a LTFV investigation, Commerce, in explaining the verification process, states:

> Verification depends precisely on tying amounts reported in questionnaire responses to the company's internal account-

ing records and financial statements. Failure to demonstrate such a relationship results in a failed verification.

56 Fed.Reg. at 31,707. Similarly, in the second source, the authors—former Commerce employees [14]—note the importance of tracing costs set forth in a response to the respondent entity's financial statements through the accounting records kept in the ordinary course of business:

> Several basic concepts underly [sic] all verification procedures.
>
> 1. The reported items are traced through the company's books (prepared in the ordinary course of business prior to the investigation) to the audited financial statements (if available)....

Parker and Bogard, *supra.*

We agree with the government that the above sources should be viewed in context. In the case of AFB, Commerce resorted to the best information available because the unreasonable allocation methodology adopted by the plaintiff frustrated the cost verification process. *See Nippon Pillow Block Sales Co. v. United States,* 820 F.Supp. 1444, 1447–49, *aff'd after remand,* 837 F.Supp. 434 (1993), *aff'd,* 34 F.3d 1078 (Fed.Cir.1994). In that case, Commerce made clear that its practice is to try to work with the respondent to devise an appropriate allocation methodology, but that one could not be devised with respect to Nippon Pillow Block. 56 Fed.Reg. at 31,707. It is in that light that we read the statement from AFB that is quoted above. The statement, which amounts to an observation by Commerce in the setting of a particular investigation, "was not necessary to the resolution of the issue." *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1189 (Fed.Cir.1995) (Nies, J., dissenting). Accordingly, we view it as the equivalent of dicta. With respect to the Parker and Bogard article, because it merely presents the views of two former Commerce employees on the verification process, it does not carry the weight of a pronouncement by the agency.

---

**14.** Marie Parker was formerly the Director of the Office of Accounting, Import Administration, Department of Commerce. Lawrence Bogard was formerly an attorney in the Office of the General Counsel, Department of Commerce.

Because we find that Commerce has not restricted itself by clarifying the verification requirement, we disagree with Micron's suggestion that our role is to determine if, in this case, Commerce fulfilled its own self-imposed obligations. We find that our role, instead, is to evaluate for reasonableness the way in which Commerce chose to interpret the verification requirement in conducting its investigation of HEI and LGS.

██ By requiring that Commerce report, on a case-by-case basis, the methods and procedures used to verify submitted information, Congress has implicitly delegated to Commerce the latitude to derive verification procedures ad hoc. Since "the action rests upon an administrative determination—an exercise of judgment in an area which Congress has entrusted to the agency—of course it must not be set aside because [we] might have made a different determination were [we] empowered to do so." *Securities & Exchange Comm. v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943).[15] Therefore, we review verification procedures employed by Commerce in an investigation for abuse of discretion rather than against previously-set standards. *Cf. American Alloys, Inc. v. United States*, 30 F.3d 1469, 1475 (Fed.Cir.1994) (noting that "the statute gives Commerce wide latitude in its verification procedures"); *Hercules, Inc. v. United States*, 673 F.Supp. 454, 469 (1987) ("The decision to select a particular methodology rests solely within Commerce's sound discretion."); *Kerr–McGee Chem. Corp. v. United States*, 739 F.Supp. 613, 628 (1990) ("Congress intended that ITA have latitude in its verification procedures and that it not be required to comply with all requests for specific types of investigation.").

Turning to the case before us, we agree with the government that the methodology of a spot check of HEI's and LGS's financial figures was reasonable. As recognized by Micron in its brief, "[i]t is *not* required that Commerce trace through every number of the response—a representative sample is sufficient." *Cf. Monsanto Co. v. United States*,

698 F.Supp. 275, 281 (1988) ("Verification is a spot check and is not intended to be an exhaustive examination of the respondent's business."). We further note that it would be unrealistic to require a full-scale audit of the foreign entity. *Cf. Bomont Indus. v. United States*, 733 F.Supp. 1507, 1508 (1990) ("[V]erification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness. Normally, an audit entails selective examination rather than testing of an entire universe."). As recognized by one commentator:

> While the anti-dumping statute unambiguously requires the ITA to verify "all" information processed by the constructed value calculations that are relied upon in making a final determination, this does not actually happen. Owing to the number of relevant issues and data points, the ITA does not, and cannot, perform the equivalent of a full-scale accounting audit of foreign respondents subject to verification. Instead, samples of suspicious data are verified until ITA accountants get a "feel" for whether data supplied by the U.S. complaintant or the foreign respondent is more accurate.

Tycho H.E. Stahl, *Problems with the United States Anti–Dumping Law: The Case for Reform of the Constructed Value Methodology*, 11 Int'l Tax & Bus. L. 1, 16 (1993) (citations omitted). Finally, in concluding that Commerce was not required to conduct full-scale audits of HEI and LGS, we are mindful of the statutory time constraints imposed on Commerce. *Cf. Monsanto*, 698 F.Supp. at 284 (noting in reference to verification that "[o]bviously, ITA must ... fulfill a statutory directive to promptly complete these investigations").

In short, we decline to impose a requirement on Commerce to trace every figure it chooses to verify back to financial statements prepared in the ordinary course of business. Instead, we conclude that Commerce's ability to make such a trace is relevant to, but not dispositve of, a finding that substantial evidence supports the verification results.

---

**15.** Our conclusion is consistent with the "general principle that agencies with statutory enforcement responsibilities enjoy broad discretion in allocating investigative and enforcement resources." *Torrington*, 68 F.3d at 1351.

Commerce's verification process in this case comported with a permissible interpretation of the statutory requirement.

### D.

▮ Having found Commerce's interpretation of the verification requirement to be reasonable, we turn to the question of whether the verification results themselves are supported by substantial evidence. We first note that Micron bears the burden of proving the evidence inadequate, and though we speak in terms of analyzing whether the verification results are supported by substantial evidence, we will disturb the Court of International Trade's decision only if Micron proves that Commerce made an antidumping determination unsupported by substantial evidence. *See Atlantic Sugar,* 744 F.2d at 1559 n. 10; Dorinda D. Bolander, *Survey of the Court of International Trade: Antidumping Actions of 1992,* 56 Alb. L.Rev. 1017, 1040 (1993). Preliminarily, we disagree with Micron's contention that the administrative record before us must contain the financial documents that would permit other parties to recreate Commerce's verification. *Cf. Bethlehem Steel Corp. v. United States,* 718 F.Supp. 70, 73 (1989) ("Although disclosure of confidential information is meant to aid in effective advocacy, petitioners' counsel are not empowered to act as independent investigators.... Petitioners should not attempt pure duplication of Commerce's function ...." (citation omitted)). Because not all the documents reviewed in the verification process are made part of the record, *see Kerr–McGee Chem. Corp. v. United States,* 739 F.Supp. 613, 617 n. 2 (1990) (noting that "all documents examined at verification are not ordinarily made part of the record"),[16] we look instead to whether a reasonable mind might accept the relevant evidence in the record as adequate to support the results of Commerce's verification. *See Hercules,* 673

F.Supp. at 469 ("When Commerce applies a reasonable standard to verify materials submitted and the verification is supported by such 'relevant evidence as a reasonable mind might accept,' the Court will not impose its own standard, superceding that of Commerce." (citing *Agrexco, Agric. Export, Co. v. United States,* 604 F.Supp. 1238, 1244 (1985))). Applying this standard, we find that a reasonable mind could find the evidence in this case adequate to support Commerce's verification results with respect to costs of production.

▮ As far as HEI is concerned, Micron asserts that the verification report and accompanying exhibits prove not only that the verification is not supported by substantial evidence, but also that there is conclusive evidence that verification was not successful. Micron cites the verification of depreciation as illustrative. In the verification report, Commerce listed the procedures it used to verify depreciation as follows:

1. Reviewed summaries of adjustments made to depreciation expense....

2. Performed reasonableness tests of depreciation summaries.

3. Reviewed depreciation summary for 1991 and 1992. Noted significant decrease in depreciation expense for machinery and equipment in Fab line 2.[17] Noted that production·remained constant during this time.

4. Traced depreciation amounts and the recorded values for machinery and equipment in Fab 3 to fixed asset ledger as of 4/30/92.

5. Traced adjusted depreciation amounts for January 1992 to the worksheets used to prepare cost information....

6. Tested asset value for the clean room and structure related to Fab 3, constructed by a related company [Hyundai Engineer-

---

**16.** We note that Commerce is not required to make all of respondent's financial documents part of the record, but is only required to "disclos[e] its methods" of verification. *See China Nat'l Metals & Minerals Import & Export Corp. v.*

*United States,* 674 F.Supp. 1482, 1486 n. 2 (1987).

**17.** "Fab" refers to "fabrication area."

ing and Construction Company] to determine if the value represented a fair market value greater than the cost of production. Noted that amounts recorded by HEI did not include any costs related [to] the general expenses or interest expenses of [Hyundai Engineering]....

With respect to steps 1, 4, and 5 above, Micron contends that the documents upon which Commerce relied are not source documents and that they were not reconciled against financial statements. Further, with respect to step 1, Micron notes that the relevant documents clearly show that the only depreciation expenses verified were those for machinery and equipment, and that other depreciation expenses, such as those for buildings, were not verified. Micron further asserts that, in Step 4, Commerce also referred to documents not "on the record," and that any conclusions based on such documents are not "supported by evidence on the record." Addressing steps 2 and 3, Micron cites to a lack of detail as to how depreciation summaries were tested for reasonableness and as to how the depreciation summaries for 1991 and 1992 were reviewed. Micron also cites to an alleged lack of detail concerning the results of these tests. Finally, as evidence that verification of depreciation was not successful, Micron points to step 6, noting Commerce's conclusion that the price paid by HEI for the clean room and the structure related to fabrication area 3 did not account for general and interest expenses of the related construction company. All of Micron's contentions lack merit, however, in light of the fact that Commerce did not use the financial information Micron now challenges, but instead, and pursuant to 19 U.S.C. § 1677e(b),[18] concluded that the submitted information was unreliable and "recalculated depreciation expense based upon BIA [best information available]." [19] Because Micron has raised no argument against Com-

merce's recalculation of HEI's depreciation expenses based upon BIA, and because Micron has not challenged Commerce's choice of BIA, there is no issue relating to depreciation expenses in dispute.

 Micron also points to statements by Commerce and the Court of International Trade that Commerce "attempted" certain verification procedures with respect to HEI's costs of production. Thus, Micron urges us to interpret an "attempted" verification as a failed one. Turning first to the common meaning of the word "attempt," we find that Webster's defines "attempt" as "to make an effort to do, accomplish, solve, or effect." *Webster's Third New International Dictionary* 140 (1986). Although Webster's also notes that the word "attempt" can be used to connote a failed attempt, *see id.* (noting that the word "attempt" is "often used in venturous or experimental situations sometimes with implications of failure"), it is clear that the term does not necessarily imply failure.

Although the dictionary definition of "attempt" provides some guidance as to the interpretation of the term, we find further, more pointed guidance from the context in which the term appears. In that regard, the excerpt from the Court of International Trade opinion that is quoted by Micron in support of its argument reads as follows: "Because [HEI] normally maintains its records in a different form than that in which it submitted its cost of production information, Commerce chose to verify [HEI's] submitted information by *attempting* to tie it to information contained in [HEI's] ordinary business records." *Micron*, 893 F.Supp. at 40 (emphasis added). Micron followed the quotation from the court's opinion by noting that "[i]f Commerce merely *attempted* to tie the information in the response to [HEI's] ordinary business records, but *did not succeed,* then it did not 'verify' the response." Mi-

---

**18.** Section 1677e(b) provides, in pertinent part, that: "If the administering authority is unable to verify the accuracy of the information submitted [by the subject entities], it shall use the best information available to it as the basis for its action...." 19 U.S.C. § 1677e(b).

**19.** "[A]s BIA the Department calculated depreciation on the assets used in the manufacturing of the product under investigation based on the gross acquisition value less 10% salvage value over its useful life, four years for all assets related to wafer fabrication and R & D and six years for assets related to assembly and test."

cron's statement, viewed in the abstract, is correct. A review of the context in which the court's statement appears, however, reveals that Micron is not correct in its articulation of the court's position. After the above-quoted exerpt, the Court of International Trade stated: "Indeed, substantial record evidence shows that Commerce *successfully tied* submitted information to information contained in [HEI's] business records for each major phase of DRAM production." *Id.*

Not only is Micron's interpretation of the word "attempt" in conflict with the context in which the word appears; it also contradicts Commerce's finding that verification was successful. Without evidence to the contrary, it is assumed that Commerce only used questionnaire response that Commerce believed were verified. *See Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 795 (Fed.Cir.1993) (" '[T]here is a presumption that public officers perform their duties correctly, fairly, in good faith, and in accordance with the law and governing regulations....' ... And this presumption stands unless there is 'irrefragable proof to the contrary.' " (quoting *Parsons v. United States*, 670 F.2d 164, 166, 229 Ct.Cl. 335 (1982) and *Torncello v. United States*, 681 F.2d 756, 770, 231 Ct.Cl. 20 (1982))). In addition, there is also record evidence to support the conclusion that Commerce was able to trace successfully the information upon which it relied. That evidence relates to research and development costs, general and administrative costs, and profit. Finally, Commerce itself notes that, where it could not verify properly the submitted information, it used the best information available. *See* 58 Fed.Reg. at 15,471 (cmt.1) ("In those instances where we found insufficient verification support, we relied upon BIA.").

 In arguing that the verification of HEI's costs is not supported by substantial evidence, Micron additionally cites: (1) Commerce's statements in the verification report that it was "unable to reconcile" certain account balances, and (2) Commerce's further statement in the verification report that it

"could not rely on [HEI's] financial statements to confirm the product specific [costs of production] presented in its submission" and that it was "unable to trace reported individual product costs to company documents prepared in the ordinary course of business."

We believe that Micron misconstrues Commerce's statement that it was unable to trace data or reconcile certain account balances. At the public hearing subsequent to the verification, Commerce made it clear that the concerns expressed in the verification report that are quoted by Micron did not represent final conclusions:

> This is an attempt to highlight issues about which the Department is concerned once it completes its initial examination of the information available to it from the verification. It is not a decision. Explicitly, it is not a decision. Secondly, and more importantly, it is an attempt to give parties an opportunity to understand, and subsequently comment on, those things about which the Department is concerned. It is, in effect, a heads up call. Although the language that follows portions of these write-ups appear to be conclusory, I think it's very important that everyone understand that each of these is merely an effort on our part to say these are the issues about which we are concerned. *It is not an effort to say these are decisions that we have made. And I think that needs to be explicitly clear for the record.*

Finally, with respect to Commerce's statement that it was not able to trace costs to company source documents, the government correctly points out that the statement was not meant to describe a failure of verification, but, rather, related to the fact that HEI's normal cost accounting system prepared unit cost information on a semi-annual basis, while its cost response reported information on a monthly basis. To prepare cost submissions, HEI was required to draft worksheets detailing the company's allocation of costs. The statement at issue simply reflects that fact. In sum, we uphold the court's decision

that Commerce's reliance on HEI's submitted cost information was proper.

■ Moving to LG Semicon, Micron contends that Commerce was not able to trace a crucial element of LGS's costs of production: Beginning Work in Process ("BWIP") for each quarter covered by the period of investigation (November 1, 1991, through April 30, 1992). In the course of the verification process, Commerce asked LGS to provide sample cost calculations relating to costs of production for two specific DRAM models—the 1 megabit ("1M") and 4 megabit ("4M") chips. LGS complied with the request, providing cost information relating to the various stages of chip development. Where possible, the cost information, which was computed on a quarterly basis, was broken down to indicate costs associated with the 1M and 4M chips. Micron contends that the manner in which the BWIP costs were presented tended to understate the costs of production.

The BWIP figure represents—at the beginning of a given quarter—the value of the DRAMs that have begun the production process but have not yet been completed. The overall cost of production for DRAMs completed during the quarter is calculated by starting with the BWIP figure, adding to it the value of the inputs during the quarter— material, labor, overhead—and subtracting from it the Ending Work in Process ("EWIP"). EWIP is equal to the BWIP at the beginning of the next quarter and therefore relates to DRAMs completed during the next quarter. Thus, Cost = BWIP + Input—EWIP. If BWIP is underestimated, as Micron contends, the cost of production for each quarter will also be understated.

To support its contention that the BWIP figures being reviewed were inaccurate, Micron directs our attention to an alleged discrepancy between cost information appearing in two different sources. We conclude, however, that the appearance of a discrepancy exists because the figures in the first source represent the total BWIP figures for all production stages, whereas the figures in the second source represent financial information relating to only one production stage—the wafer fabrication stage. After examining costs of production by taking into consideration the fact that certain figures are not broken down by product line and that other figures represent only specific production stages, we are able to reconcile the BWIP figures. Our ability to reconcile the BWIP numbers belies Micron's attempt to prove that substantial evidence does not support Commerce's reliance on the BWIP data.

After a careful and thorough review of the record, we are satisfied that Commerce's reliance on LGS's costs of production is supported by substantial evidence. Although the record may not present a paragon of clarity, we find that it contains a sufficient basis upon which to affirm the Court of International Trade's decision. *See Ceramica Regiomontana, S.A. v. United States,* 810 F.2d 1137, 1139 (Fed.Cir.1987) (noting that a court may " 'uphold [an agency's] decision of less than ideal clarity if the agency's path may reasonably be discerned.' " (quoting *Bowman Transp. v. Arkansas–Best Freight Sys.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)) (alteration in original)).

## CONCLUSION

For the foregoing reasons, the decision of the Court of International Trade is affirmed.

## COSTS

Each party shall bear its own costs.

*AFFIRMED.*