SHAKEPROOF ASSEMBLY COMPONENTS, DIVISION OF ILLINOIS TOOL WORKS, INC., Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Appellee.

No. 00–1521.

United States Court of Appeals, Federal Circuit.

Oct. 12, 2001.

Stephen M. Creskoff, Creskoff & Doram LLP, of Washington, DC, argued for plaintiff-appellant. Of counsel was Lisa E. Smilan.

Lucius B. Lau, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief was David M. Cohen, Director. Of counsel were Robert E. Nielsen, John D. McInerney, and Berniece A. Browne, Attorneys, Department of Commerce, of Washington, DC.

Before CLEVENGER, SCHALL, and GAJARSA, Circuit Judges.

GAJARSA, Circuit Judge.

This case involves the appeal of the decision of the United States Court of International Trade that sustained the final antidumping determination issued by the United States Department of Commerce International Trade Administration ("Commerce"). *Shakeproof Assembly Components v. United States*, 102 F.Supp.2d 486 (C.I.T.2000) ("*Shakeproof II*"). On November 19, 1997, Commerce issued its final determination regarding "Certain Helical Spring Lock Washers from the People's Republic of China." *See* Final Results of Antidumping Duty Administrative Review, 62 Fed.Reg. 61794–801 (Nov. 19, 1997) ("Final Determination"). The antidumping determination encompasses Helical Spring Lock Washers ("Washers") imported from Chinese manufacturer Zhejian Wanxin Group, Ltd. ("ZWG") between October 1, 1995 and September 30, 1996. Commerce ultimately assigned an antidumping margin of 14.15% on Washers imported from ZWG during the period of review. Shakeproof Assembly Components ("Shakeproof"), a United States manufacturer of Washers, challenges the methodology used by Commerce in its final determination. Shake-

proof argues that the antidumping margin should instead be approximately 38%, based on its asserted normal value of the steel wire rod ("steel") used to manufacture the Washers.[1]

For the reasons discussed below, we affirm.

## I. BACKGROUND

On November 19, 1997, Commerce issued its Final Determination in this case. 62 Fed.Reg. 61794–801 (Nov. 19, 1997). Shakeproof challenged the determination before the United States Court of International Trade, and disputed the methodology by which Commerce calculated the value of the steel used to manufacture the Washers. Shakeproof argued that it was improper for Commerce to determine the value of the steel based on the price paid for steel imported by ZWG from the United Kingdom. Specifically, ZWG purchased approximately one-third (34.7%) of its steel from the United Kingdom, and the remaining two-thirds (65.3%) from domestic Chinese producers. Commerce established the normal value of 100% of the steel based on the import price of the steel purchased from the United Kingdom. Shakeproof argued that the normal value of the domestically purchased Chinese steel should instead be determined based on the "factors of production" using India as a surrogate country pursuant to 19 U.S.C. § 1677b(c) (1994).

On July 29, 1999, the United States Court of International Trade remanded the case in order for Commerce to further explain "how its use of import prices to value the entire factor of production for steel wire rod promoted accuracy, including but not limited to how it was more accurate than the use of the surrogate value." *Shakeproof Assembly Components v. United States*, 59 F.Supp.2d 1354, 1360–61 (C.I.T.1999) (*"Shakeproof I"*). The trial court reasoned that "[w]hether Commerce's use of imported prices to value an entire factor of production is reasonable is inextricably linked to whether the methodology promotes accuracy." *Id.* at 1358 (citing *Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1445 (Fed.Cir. 1994)).

On September 27, 1999, Commerce responded to the trial court's remand order by issuing an additional explanation, entitled Final Results of Redetermination on Remand ("Remand Determination"). The Remand Determination stated:

> The purpose of the factors of production methodology is to determine what [normal value] would be if the producer's costs were set by the market forces in a comparable economy. Because the import price is an actual market price paid by the [non-market economy] producer it provides a more accurate value than other potential surrogates. Therefore, the actual price paid for the imports constitutes the best available information for valuing this factor.

Commerce explained that, "the actual price paid for inputs imported from a market economy in meaningful quantities is the best available information and promotes accuracy in the dumping calculation." Commerce further stated that it would find imports "meaningful" if it could "reasonably conclude from the quantities

---

**1.** The normal value of goods in "market economy" cases is generally the price at which the foreign product is first sold in the exporting country. 19 U.S.C. § 1677b(a)(1)(B)(i) (1994). In nonmarket economies such as China, there is a presumption that exports are under the control of the state. Thus, the normal value of goods in non-market economies may be instead determined by looking at the "factors of production" used to manufacture the goods. 19 U.S.C. § 1677b(c) (1994). The "factors of production" analysis is discussed, *infra*.

sold, and other aspects of the transactions, that the price paid is a reliable market economy value for the input." Commerce indicated that, in the present case, ZWG purchased 65.3% of the steel from seven domestic Chinese suppliers, and imported 34.7% of the steel from the United Kingdom. Commerce also noted that the amount imported from the United Kingdom "exceeded the amounts purchased from any one of the seven" domestic Chinese suppliers. Commerce determined that ZWG imported "meaningful" amounts of identical steel from the United Kingdom. Moreover, Commerce explained why the import price was more accurate than a surrogate value:

> In [non-market economy] countries we do not have market economy prices and, thus, are forced to resort to the best available information, which is often a surrogate value. At best, this surrogate value represents only an estimate of what [a non-market economy] producer might pay for the factor in question if it were operating in a market economy setting. In this case, however, we have an actual, market economy price for steel wire rod paid by the [non-market economy] producer in question. It is an actual price determined by market economy forces which has been paid to the market economy supplier by the respondent in convertible currency. Thus, the actual market economy price is both reliable and accurate.

Thus, Commerce concluded that the United Kingdom import price was a more reliable and more accurate basis for establishing the normal value of the domestic steel.

On June 9, 2000, the United States Court of International Trade affirmed the Remand Determination. *Shakeproof II*, 102 F.Supp.2d at 496. The trial court reasoned that the Remand Determination demonstrated "how its use of import prices promotes accuracy." *Id.* at 495. Shakeproof timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5) (1994).

## II. STANDARD OF REVIEW

■ The Court of International Trade reviews Commerce's decision to determine whether it is "unsupported by substantial evidence in the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994). We reapply this standard of review to Commerce's determination. *Cemex v. United States*, 133 F.3d 897, 900 (Fed.Cir.1998).

■ We review questions of statutory interpretation without deference. *U.S. Steel Group v. United States*, 225 F.3d 1284, 1286 (Fed.Cir.2000). In reviewing an agency's construction of a statute that it administers, this court addresses two questions as required by the Supreme Court's decision in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The first question is "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. 2778. If so, this court and the agency "must give effect to the unambiguously expressed intent of Congress." *Id.* at 843, 104 S.Ct. 2778. If, however, Congress has not spoken directly on the issue, this court addresses the second question of whether the agency responsible for filling a gap in the statute has rendered an interpretation that "is based on a permissible construction of the statute." *Id.; see also United States v. Mead Corp.*, 533 U.S. 218, ——, 121 S.Ct. 2164, 2185, 150 L.Ed.2d 292 (2001); *Micron Tech., Inc. v. United States*, 243 F.3d 1301, 1308 (Fed.Cir.2001). In other words, Commerce's interpretation will not be set aside unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778.

In antidumping cases, this court has previously recognized "Commerce's special expertise," and it has "accord[ed] substantial deference to its construction of pertinent statutes." *Micron Tech., Inc. v. United States,* 117 F.3d 1386, 1394 (Fed. Cir.1997). Even where Commerce has not engaged in notice-and-comment rulemaking, its statutory interpretations articulated in the course of antidumping proceedings draw *Chevron* deference. *United States v. Mead Corp.,* 533 U.S. 218, —, 121 S.Ct. 2164, 2171, 150 L.Ed.2d 292 (2001) (holding that an "[a]dministrative interpretation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority"); *Am. Silicon Techs. v. United States,* 261 F.3d 1371 (Fed.Cir. 2001). *See also Pesquera Mares Australes Ltda. v. United States, et al,* 266 F.3d 1372 (Fed.Cir.2001).

## III. DISCUSSION

Commerce's decision to determine the normal value of all steel based on the purchase price of steel imported from the United Kingdom is based on its interpretation of 19 U.S.C. § 1677b(c) (1994). The statutory provision requires Commerce to determine the normal value of merchandise exported from a non-market economy country "on the basis of the value of the factors of production utilized in producing the merchandise." 19 U.S.C. § 1677b(c)(1) (1994). Specifically, the statute provides:

[T]he valuation of the factors of production shall be based on the *best available information* regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

19 U.S.C. § 1677b(c)(1) (1994) (emphasis added). In valuing the factors of production, the statute requires Commerce to:

[U]tilize, *to the extent possible,* the prices or costs of factors of production in one or more market economy countries that are (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise.

19 U.S.C. § 1677b(c)(4) (1994) (emphasis added).

The statutory provisions specifically authorize Commerce to use surrogate countries to estimate the value of the factors of production. However, the statute does not *require* Commerce to always use surrogate country values. The process of constructing foreign market value for a producer in a non-market economy country is difficult and necessarily imprecise. *Nation Ford Chem. Co. v. United States,* 166 F.3d 1373, 1377 (Fed.Cir.1999). "While § 1677b(c) provides guidelines to assist Commerce in this process, this section also accords Commerce wide discretion in the valuation of factors of production in the application of those guidelines." *Id.* Indeed, we have specifically held that Commerce may depart from surrogate values when there are other methods of determining the "best available information" regarding the values of the factors of production. *Lasko,* 43 F.3d at 1446; *see also Nation Ford,* 166 F.3d at 1378 n. 5 ("The statute does not preclude consideration of pricing or costs beyond the surrogate country if necessary."). In *Lasko,* Commerce issued a final antidumping determination on certain fans imported from China. In that case, Commerce determined the normal value based on both surrogate values and known prices paid for certain manufacturing supplies on the international market. We held that this methodology

was a reasonable interpretation of the statutory provisions. Specifically, we reasoned:

> The Act simply does not say—anywhere—that the factors of production must be ascertained in a single fashion. The Act requires the [Commerce] determination to be based on the best available information.... In this case, the best available information on what the supplies used by the Chinese manufacturers would cost in a market economy country was the price charged for those supplies on the international market.

*Lasko,* 43 F.3d at 1446. We reasoned that the purpose of the statutory provisions is to determine antidumping margins "as accurately as possible." *Id.* We also observed that "[w]here we can determine that a [non-market economy] producer's input prices are market determined, accuracy, fairness, and predictability are enhanced by using those prices. Therefore, using surrogate values when market-based values are available would, in fact, *be contrary to the intent of the law." Id.* (emphasis added). Thus, there is no question that Commerce may determine the normal value of the steel imported from the United Kingdom based on the actual purchase price.

■■■■■ However, Shakeproof argues that Commerce improperly determined the normal value of the domestically produced steel by extrapolating the purchase price of the steel imported from the United Kingdom to the domestically produced steel. We disagree. As we observed in *Lasko,* the statute does not require the factors of production to be ascertained in a single fashion. 43 F.3d at 1446. Moreover, the statute does not require that Commerce always use surrogate country values. Indeed, the statute requires the valuation of the factors of production to be based "on the best available information." 19 U.S.C. § 1677b(c)(1) (1994). Surrogate

country values represent only an *estimate* of what a non-market economy manufacturer might pay in a market economy setting. Thus, the statute recognizes that surrogate values are used only "to the extent possible." 19 U.S.C. § 1677b(c)(4) (1994).

■■■■ In determining the valuation of the factors of production, the critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible. Commerce argues that the actual price paid for inputs imported from a market economy in meaningful quantities is the best available information and promotes accuracy in the dumping calculation. Commerce notes that the value of the factors of production for domestically purchased merchandise may be obtained by extrapolating the market economy import price only when a "meaningful" amount of merchandise is imported. Although we recognize that the level of a "meaningful" amount of imported merchandise must be determined on a case-by-case basis, we are persuaded that the steel imported from the United Kingdom in this case constitutes a "meaningful" amount. The steel imported from the United Kingdom constitutes approximately one-third of all steel used by ZWG in manufacturing the Washers. Moreover, the amount of steel imported from the United Kingdom exceeds the amount purchased from any one of the seven domestic Chinese steel suppliers.

Commerce contends that using the actual import price of steel purchased from the United Kingdom is more accurate than the use of surrogate data. In *Lasko,* we recognized that surrogate country values are, at best, an *estimate* of the true value of the factors of production. 43 F.3d at 1445. In this case, however, one-third of the steel was purchased from a market econo-

my country, with a price set by market forces in an arms length transaction. Commerce notes that the steel purchased from the United Kingdom is identical to the steel purchased from domestic Chinese suppliers. Thus, we agree that the best available and most accurate information regarding the normal value of the domestically obtained steel is the purchase price of the steel imported from the United Kingdom. Commerce's Remand Determination demonstrates that the methodology used in this case is a permissible interpretation of 19 U.S.C. § 1677b(c) (1994). *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778.

Shakeproof advances three additional arguments. First, Shakeproof contends that the Remand Determination is vague and does not adequately comply with the remand order issued by the Court of International Trade. Shakeproof argues that we should remand this case and instruct Commerce to more specifically show how the methodology used in this case promotes accuracy. However, we agree with the trial court, that "Commerce sufficiently followed the [c]ourt's mandate." *Shakeproof II*, 102 F.Supp.2d at 492. The Remand Determination adequately and thoroughly explains why the methodology used in this case is more accurate than surrogate values.

Second, Shakeproof maintains that Commerce failed to assess the reliability of the import prices under the more exacting analysis described in *Olympia Indus., Inc. v. United States*, 36 F.Supp.2d 414, 416 (C.I.T.1999). However, as recognized by the trial court, "a critical difference exists between the facts of *Olympia* and the facts of this case." *Shakeproof II*, 102 F.Supp.2d at 494. In *Olympia*, Commerce used a three-part analysis to assess the reliability of import prices paid by a Chinese trading company that resold the inputs to Chinese manufacturers. In this case, however, "the [Chinese] producer

purchased its steel wire rod from a market economy supplier through a market economy trading house and paid in market economy currency." *Shakeproof II*, 102 F.Supp.2d at 494. Thus, Commerce is not required to apply the analysis used in *Olympia* to this case.

■■■ Third, Shakeproof argues that Commerce failed to verify ZWG's import data. Commerce is required to verify the information used in making a final antidumping determination if:

(A) verification is *timely requested* by an interested party ... *and*

(B) no verification was made under this subparagraph during the 2 immediately preceding reviews and determinations ... except that this clause shall not apply if good cause for verification is shown.

19 U.S.C. § 1677m(i) (1994) (emphasis added). In all cases, therefore, verification must be timely requested by an interested party. Shakeproof concedes that it did not request verification, but maintains that it did not have a reasonable opportunity to request verification because it was unaware that Commerce would use the import prices. Commerce, however, states that Shakeproof could have requested "good cause" verification during the administrative review. Shakeproof cannot now argue that the information should have been verified when it failed to timely request verification as required by statute. We also note that verification had occurred during the first administrative review. Thus, even if Shakeproof had made a request, Commerce need have only verified information upon a showing of good cause. Based on its analysis of the information, Commerce concluded that further verification was not warranted. Commerce did not abuse its discretion by determining that there was not "good cause" for further verification. *Cf. Micron Technology, Inc. v. United States*, 117 F.3d 1386, 1396

(Fed.Cir.1997) (holding that we review Commerce's verification procedures for an abuse of discretion).

### IV. CONCLUSION

For the reasons discussed, the decision of the Court of International Trade is

*AFFIRMED.*

COSTS

No costs.