**Slip Op. 03-33**

# UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: RICHARD K. EATON, JUDGE**

| | | |
|---|---|---|
| **YANTAI ORIENTAL JUICE CO., ET AL.,** | : | |
| Plaintiffs, | : | |
| v. | : | **Court No. 00-00309** |
| **UNITED STATES**, | : | |
| Defendant, | : | |
| and | : | |
| **COLOMA FROZEN FOODS, INC., ET AL.,** | : | |
| Defendant-Intervenors. | : | |

[Antidumping determination remanded to Commerce.]

Decided: March 21, 2003

Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt L.L.P. (Bruce M. Mitchell, Jeffrey S. Grimson and Mark E. Pardo), for Plaintiffs.

Robert D. McCallum Jr., Assistant Attorney General, Civil Division, United States Department of Justice; David M. Cohen, Director, Civil Division, Commercial Litigation Branch, United States Department of Justice; Lucius B. Lau, Assistant Director, International Trade Section, Civil Division, Commercial Litigation Branch, United States Department of Justice; Scott D. McBride, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for Defendant.

The Law Firm of C. Michael Hathaway (C. Michael Hathaway), for Defendant-Intervenors.

**MEMORANDUM OPINION AND ORDER**

EATON, Judge: This matter is before the court on the motion of Yantai Oriental Juice Co. ("Yantai Oriental"), Qingdao Nannan Foods Co. ("Nannan"), Sanmenxia Lakeside Fruit Juice Co., Ltd. ("Lakeside"), Shaanxi Haisheng Fresh Fruit Juice Co. ("Haisheng"), Shandong Zhonglu Juice Group Co. ("Zhonglu"), Xianyang Fuan Juice Co., Ltd. ("Fuan"), Xian Asia Qin Fruit Co., Ltd. ("Asia"), Changsha Industrial Products & Minerals Import & Export Corp. ("Changsha Industrial"), and Shandong Foodstuffs Import & Export Corp. ("Shandong Foodstuffs") (collectively "Plaintiffs") for judgment upon the agency record pursuant to USCIT R. 56.2. By their motion, Plaintiffs contest certain aspects of the determination of the United States Department of Commerce ("Commerce" or the "Department") resulting from its antidumping investigation of non-frozen apple juice concentrate ("AJC") from the People's Republic of China ("PRC"), see Certain Non-Frozen Apple Juice Concentrate from the P.R.C., 65 Fed. Reg. 19,873 (Dep't Commerce Apr. 13, 2000) (final determination) ("Final Determination"), amended by Certain Non-Frozen Apple Juice Concentrate From the P.R.C., 65 Fed. Reg. 35,606 (Dep't Commerce June 5, 2000) (am. final determination) ("Am. Final Determination"), covering the period of investigation ("POI") of October 1, 1998, through March 31, 1999. The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(A)(i)(I). For the reasons set forth below, the court again remands this matter to Commerce with instructions to conduct further proceedings in conformity with this opinion.

## BACKGROUND

On June 18, 2002, the court remanded this matter and directed Commerce to reexamine its surrogate country selection, and the various factors of production, used to calculate the antidumping duty margins for PRC AJC producers/exporters in the Final Determination. See Yantai Oriental Juice Co. v. United States, 26 CIT __, Slip Op. 02-56 (June 18, 2002) ("Remand Order"). Familiarity with this opinion is presumed.

On November 15, 2002, Commerce released the results of its remand determination. See Yantai Oriental Juice Co. v. United States, 00-00309 (Dep't Commerce Nov. 15, 2002) (redetermination pursuant to court remand) ("Remand Determination"). Upon remand Commerce determined that: (1) Turkey, not India, was the proper surrogate country; (2) in light of its selection of Turkey as the surrogate country and the resultant reevaluation of the various factors of production, Yantai Oriental, Nannan, Lakeside, Haisheng, and Zhonglu (collectively the "Fully-Investigated Respondents") were "excluded" from the antidumping order and, thus, their antidumping duty margins were zero percent; and (3) because the Fully-Investigated Respondents' antidumping duty margins were lowered to zero percent, and because the antidumping duty margin for Fuan, Asia, Changsa Industrial, and Shandong Foodstuffs (i.e., companies that fully responded to Commerce's antidumping questionnaire but were not selected for investigation) (collectively the "Cooperative Respondents") was calculated from the Fully-Investigated Respondents' antidumping duty margins in the Final Determination, it was necessary to recalculate the Cooperative Respondents' antidumping duty margin for the Remand Determination. As a result of this recalculation the Cooperative Respondents' antidumping duty

margin increased from 14.88 percent to 28.33 percent.

## DISCUSSION

When reviewing the Remand Determination pursuant to 28 U.S.C. § 1581(c), the court will sustain Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938); Daewoo Elecs. Co. v. United States, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (quoting Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 932 n.10 (Fed. Cir. 1984)). However, "Commerce must articulate a 'rational connection between the facts found and the choice made.'" Rhodia, Inc. v. United States, 25 CIT __, __, 185 F. Supp. 2d 1343, 1348 (2001) (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)).

### A. Surrogate Country/Factors of Production

To determine whether subject merchandise is being, or is likely to be, sold in the United States at less than fair value, Commerce must make "a fair comparison . . . between the export price or constructed export price and normal value." 19 U.S.C. § 1677b(a); 19 C.F.R. § 351.401(a) (2002). Where, as here, the subject merchandise is exported from a nonmarket economy country ("NME"), Commerce is directed by statute to calculate normal value "on the basis of the value of the factors of production utilized in producing the merchandise . . . ." 19 U.S.C. § 1677b(c)(1); 19 C.F.R. § 351.408(a). When valuing factors of production in NME

circumstances, subsection 1677b(c) directs Commerce to gather surrogate prices from "the best available information . . . in a market economy country . . . considered to be appropriate by the administering authority."  19 U.S.C. § 1677b(c)(1); see Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999) ("Whether such analogous information from the surrogate country is 'best' will necessarily depend on the circumstances, including the relationship between the market structure of the surrogate country and a hypothetical free-market structure of the NME producer under investigation.").  This being the case, "the process of constructing foreign market value for a producer in [an NME] is difficult and necessarily imprecise . . . ."  Sigma Corp. v. United States, 117 F.3d 1401, 1408 (Fed. Cir. 1997).  Commerce enjoys wide discretion in valuing factors of production.  See Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442, 1446 (Fed. Cir. 1994); see also Sigma, 117 F.3d at 1405 (citing Torrington Co. v. United States, 68 F.3d 1347, 1351 (Fed. Cir. 1995)) ("Commerce . . . has broad authority to interpret the antidumping statute . . . .").  However, Commerce's discretion in calculating surrogate prices is not limitless.  See Omnibus Trade and Competitiveness Act of 1988, H.R. Conf. Rep. No. 100-576, at 590 (1988), reprinted in 1988 U.S.C.C.A.N. 1547, 1623 ("Commerce shall avoid using any prices which it has reason to believe or suspect may be . . . subsidized prices."); see also Shakeproof Assembly Components, Div. of Ill. Toolworks, Inc. v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001) ("In determining the valuation of the factors of production, the critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible.").

Commerce, in accordance with the Remand Order, reexamined various aspects of the

Final Determination including: (1) the selection of India as the surrogate country; (2) the valuation of Indian juice apples and, specifically, how a government market intervention scheme ("MIS") may have affected the price of such apples; (3) the valuation of domestic steam coal; (4) the use of certain financial data from an Indian grower of apples; and (5) the calculation of certain freight rates.

###### 1. Surrogate Country

In the Final Determination Commerce selected India as the surrogate country for PRC AJC production. The court found Commerce's selection, based on the determination that India was a "significant producer of AJC," to be unsupported by substantial evidence and otherwise not in accordance with law. See Remand Order at 11. Commerce's determination was found to be not in accordance with law because it was based on uncorroborated secondary information—a market study commissioned by the petitioners.[1] Id. Commerce's determination was found to be unsupported by substantial evidence because Commerce merely adopted the conclusions found in the petitioners' market study but did not "articulate a 'rational connection between the facts found and the choice made.'" Remand Order at 12 (citing Rhodia, 25 CIT at __, 185 F. Supp. 2d at 1348). On remand, Commerce reexamined its selection of India as the proper surrogate country for PRC AJC production and stated that it had

> concluded that the record does not support our determination in the

---

[1] The Defendant-Intervenors in this action, Coloma Frozen Foods, Inc., Green Valley Packers, Knouse Foods Cooperative, Inc., Mason Country Fruit Packers, and Tree Top, Inc., were the petitioners at the administrative level. See Certain Non-Frozen Apple Juice Concentrate From the PRC, 64 Fed. Reg. 36,330, 36,330 (Dep't Commerce July 6, 1999) (initiation of investigation).

> investigation that India was a significant producer of [AJC].
> Instead, the Department has determined that Turkey is a more
> appropriate surrogate country for the [PRC] because it is the
> country most economically comparable to the PRC that is also a
> significant producer of AJC. Therefore, the Department has
> amended its calculations using Turkish data to value juice apples,
> [selling, general and administrative] expenses, overhead, and
> profit.

Remand Determination at 1 (citations omitted). In support of its selection of Turkey as the

appropriate surrogate country, Commerce explained:

> Section 773 (c)(4) of the Act directs the Department to value the
> [NME] producers' factors of production in a market economy
> country that is both (1) economically comparable to the NME and
> (2) a significant producer of comparable merchandise, to the extent
> possible. Thus, it is the Department's policy to select a surrogate
> country that meets both of these requirements, when it is possible
> to do so.
>
> In the underlying investigation, the Department concluded that
> India was both economically comparable to the PRC and a
> significant producer of comparable merchandise. Hence, the
> Department selected India as its primary surrogate in this
> proceeding.
>
> In response to the concerns raised by the Court in its remand order,
> the Department reexamined closely the investigation record. Based
> on its reexamination, the Department reasoned that India could be
> a significant producer of comparable merchandise given its high
> level of apple production. However, the Department concluded
> that it lacked appropriate benchmarks for determining what
> constitutes significant production. Thus, the Department proposed
> two measures of significant production and attempted to apply
> them using the information in the investigation record.
> Unfortunately, the record did not contain sufficient information
> pertaining to alternative surrogate possibilities because once the
> Department had accepted India as an appropriate surrogate for AJC
> production in the investigation, there was no need or cause for
> parties to supply further comments on the record regarding other
> potential surrogate countries.

> Consequently, as a result of the Court's underlying determination and analysis, the Department developed two measures of significant production: Whether India (or any other country economically comparable to the PRC) was a significant net-exporter of AJC and whether any was a major exporter of AJC to the United States. . . .

> The only source of information [among those examined by the Department] that consistently provided export and import information for India and the other comparable economies identified by the Department in the investigation (as well as all other worldwide exporters of AJC) was [the United Nations Food and Agriculture Organization ("FAOSTAT")]. . . .

> As the [data from FAOSTAT] shows, neither India nor any other country identified by the Department in the investigation as being economically comparable to the PRC is a significant net-exporter or a major exporter to the United States. In fact, during the relevant period, India was a net importer of AJC.

Remand Determination at 4–5. Thus, Commerce determined that Turkey was the appropriate

surrogate country for valuing factors of production. Id. at 7.


### 2.     Juice Apple Valuation

In the Final Determination Commerce determined that the price paid for Indian juice

apples was a factor of production. The court found Commerce's determination to be

unsupported by substantial evidence on the record as Commerce had not adequately explained

why the MIS administered by the national and local Indian governments—which administration

included subsidizing Indian apple growers and controlling an entity that further "administered the

MIS to [the governments'] detriment"—did not affect the valuation of apples. Remand Order at

18. On remand, Commerce determined that any possible effects of the MIS on the price of

Indian juice apples to be a "moot" issue as "the Department is using Turkish juice apple

prices . . . ." <u>Remand Determination</u> at 10.

### 3.    Steam Coal Valuation

In the <u>Final Determination</u> "the Department calculated the value for steam coal using Indian import statistics because the Department concluded that the import statistics were the 'best available information.'" <u>Remand Determination</u> at 10.  Commerce reasoned that the import statistics it relied on were the "best available information" because they were "more contemporaneous with the POI than the data submitted by plaintiffs . . . ." <u>Id.</u>  The court questioned Commerce's selection of import statistics for valuing domestic Indian coal because there was no indication that (1) the prices for domestic Indian steam coal were distorted or (2) that the "use of imported values 'best approximate[d] the cost incurred' for Indian AJC production." <u>Remand Order</u> at 24.  After reviewing the record, Commerce determined that it would use the "domestic price in India to value steam coal." <u>Remand Determination</u> at 10.  In support of its use of domestic Indian steam coal prices Commerce stated:

> While we continue to believe that contemporaneity is an important consideration in selecting valuation data, we have reviewed the information in this case and have concluded that both the import statistics and the domestic prices preceded the POI, and hence, neither was contemporaneous with the POI.  Moreover, there is no evidence suggesting that the domestic Indian prices were distorted.

<u>Id.</u> (citing <u>Creatine Monohydrate from the P.R.C.</u>, 67 Fed. Reg. 10,892 (Dep't Commerce Mar. 11, 2002) (final results); <u>Certain Preserved Mushrooms from the P.R.C.</u>, 67 Fed. Reg. 46,173 (Dep't Commerce July 12, 2002) (final results and partial rescission of antidumping rev.)).[2]

---

[2]    Although Commerce did not use Turkish prices for the valuation of domestic steam coal, no argument is made that the use of alternative Indian data for this factor was

### 4.      Valuation of Selling, General, and Administrative Expenses, and Overhead Ratios

In the Final Determination Commerce relied on financial data for selling, general, and administrative expenses ("SG&A"), and overhead ratios based on generalized Indian financial data from the Reserve Bank of India Bulletin. Remand Order at 24. The court questioned the use of such data as there was publically available audited financial information from an Indian producer of AJC, Himachal Pradesh Horticultural Produce Marketing and Processing Corporation. Id. at 26. On remand, Commerce determined that this issue was "moot" because "the Department is using information from a Turkish company to determine the factory overhead, SG&A and profit ratios . . . ." Remand Determination at 11.

### 5.      East Coast Surrogate Freight Rates Calculation

In the Final Determination Commerce "included freight to Detroit in calculating the East Coast average freight rate." Remand Determination at 11. The court found that neither Commerce nor the Government had addressed adequately the issue of how including the Detroit shipment in the East Coast freight rate was appropriate given that there was no "weighting" of this rate in Commerce's calculation of the East Coast rate. See Remand Order at 29–30. On remand, Commerce stated that it

> agrees with the Court that Detroit should not be included in the calculation of the East Coast average freight rate in this case, given that the record evidence does not show that Detroit shippers were transporting goods by way of the East Coast. Therefore, the Department has calculated an East Coast rate, a West Coast rate, and a separate Detroit rate. Because we have calculated different

improper in the instant investigation.

rates for the different destinations, the weighting issue raised by the
Court does not arise.

Remand Determination at 11.


### 6.      Conclusion

The court finds that Commerce has complied with its remand order with respect to the

selection of the proper surrogate country and the various factors of production.  Moreover, as

Plaintiffs do not take issue with Commerce's selection of Turkey as the proper surrogate country

or otherwise challenge Commerce's selection of the proper factors of production used to

calculate the Fully-Investigated Respondents' antidumping duty margins, the court, therefore,

finds Commerce's determination in this regard to be supported by substantial evidence and

otherwise in accordance with law, and sustains Commerce's determination that the Fully-

Investigated Respondents should receive antidumping duty margins of zero percent.


### B.      Cooperative Respondents' Antidumping Duty Margin

In the original investigation the Cooperative Respondents' antidumping duty margin was

calculated to be 14.88 percent.  See Am. Final Determination, 65 Fed. Reg. at 35,607.  This

antidumping duty margin was based on the weighted average of the Fully-Investigated

Respondents' antidumping duty margins.[3]  See Final Determination, 65 Fed. Reg. at 19,874; see

---

[3]      While Commerce does not specifically state that it used the "all-others"
methodology of 19 U.S.C. § 1673d(c)(5)(A) to calculate the Cooperative Respondents'
antidumping duty margin in the Final Determination, Commerce's methodology is consistent
with that subsection.  See Final Determination, 64 Fed. Reg. at 19,874 (citing Bicycles from the
P.R.C., 61 Fed. Reg. 19,026 (Dep't Commerce Apr. 30, 1996) (final determination)) ("For those
PRC producers/exporters that responded to our separate rates questionnaire . . . but did not

also 19 U.S.C. § 1673d(c)(5)[4]; Coalition for the Pres. of Am. Brake Drum & Rotor Aftermarket

Mfrs. v. United States, 23 CIT 88, 109, 44 F. Supp. 2d 229, 249 (1999).  In the Remand

Determination, however, because the Fully-Investigated Respondents received antidumping duty

margins of zero percent, Commerce decided that a new methodology was needed to calculate that

margin.  See Remand Determination at 14.  Commerce determined that it would continue to

calculate the Cooperative Respondents' margin following the "all-others" methodology found in

19 U.S.C. § 1673d(c)(5).  See id.  However, because all of the margins in the investigation were

---

respond to the full antidumping questionnaire . . . we have calculated a weighted-average margin
based on the rates calculated for the fully-examined responding companies, except that we did
not include rates which were zero . . . [or] based entirely on facts available (i.e., the PRC-wide
rate) . . . .").

[4]     This subsection provides:

(A) General rule

For purposes of this subsection . . . the estimated all-others rate
shall be an amount equal to the weighted average of the estimated
weighted average dumping margins established for exporters and
producers individually investigated, excluding any zero and de
minimis margins, and any margins determined entirely [on facts
available].

(B) Exception

If the estimated weighted average dumping margins established for
all exporters and producers individually investigated are zero or de
minimis margins, or are determined entirely [on facts available],
the administering authority may use any reasonable method to
establish the estimated all-others rate for exporters and producers
not individually investigated, including averaging the estimated
weighted average dumping margins determined for the exporters
and producers individually investigated.

19 U.S.C. § 1673d(c)(5)(A)–(B).

either (1) zero, i.e., the Fully-Investigated Respondents' margins, or (2) based on facts available,

i.e., the PRC-wide margin, Commerce did not follow the methodology of 19 U.S.C. §

1673d(c)(5)(A) but, instead, looked to 19 U.S.C. § 1673d(c)(5)(B).  See Remand Determination

at 14.  In support of this determination Commerce explained that

> [a]s all the dumping rates in this redetermination on remand are
> now either . . . zero or based entirely on facts available, we have
> applied the methodology of section [1673d(c)(5)(B)] which is
> consistent with that used in determining the "all-others" rate (i.e.,
> the rate applied to companies not individually investigated) in a
> market economy case under the same circumstances.  Section
> [1673d(c)(5)(B)] states that in situations where the estimated
> weighted-average dumping margins established for all exporters
> and producers individually investigated are zero or de minimis, or
> are determined entirely [on facts available] under section 776, "the
> administering authority may use any reasonable method to
> establish the estimated all-others rate for exporters and producers
> not individually investigated, including averaging the weighted-
> average dumping margins determined for the exporters and
> producers individually investigated."  The Statement of
> Administrative Action states that in using any reasonable method
> to calculate the all-others rate, "[t]he expected method in such
> cases will be to weight-average the zero and de minimis margins
> and margins determined pursuant to the facts available, provided
> that volume data is available."  Thus, consistent with section
> [1673d(c)(5)(B)], we have determined the separate rates for these
> companies which were not individually investigated by weight-
> averaging the zero margins and margins determined pursuant to
> facts available.

Id. (citing Statement of Administrative Action accompanying the Uruguay Round Agreements

Act, H.R. Doc. No. 103-826(I), at 873 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201

("SAA")).[5]  Using what it calls the "expected" method, Commerce calculated the Cooperative

---

[5]      The SAA states that 19 U.S.C. § 1673d(c)(5)(B)

provides an exception to [19 U.S.C. § 1673d(c)(5)(A)] if the
dumping margins for all of the exporters and producers that are

Respondents' "weighted average" margin based on the PRC-wide margin of 51.74 percent and the Fully-Investigated Respondents' margins of zero percent. Id. In its original investigation Commerce had determined the 51.74 percent PRC-wide margin by selecting "the higher of: (1) The highest margin stated in the notice of initiation; or (2) the highest margin calculated for any respondent in this investigation." See Final Determination, 65 Fed. Reg. at 19,874 (citing Stainless Steel Wire Rod from Japan, 63 Fed. Reg. 40,434 (Dep't Commerce July 29, 1998) (final determination)). Thus, using this methodology Commerce assigned a PRC-wide margin using data contained in the petition, which was "higher than the margin calculated for any respondent in this investigation." Id. It is worth noting that calculation of this PRC-wide margin of 51.74 percent was based, in part, on financial data from India that is no longer relevant to the instant investigation. See, e.g., Antidumping Investigation Initiation Checklist, Conf. R. Doc. 6 at 10–11, 15 (citing Pet. for the Imposition of Antidumping Duties: Certain Non-Frozen Apple Juice Concentrate from China, Conf. R. Doc. 1 Ex. 12 Attach. M, at 29 (schedule 16)).

Plaintiffs object to Commerce's methodology for recalculating the Cooperative

---

individually investigated are determined entirely on the basis of the facts available or are zero or de minimis. In such situations, Commerce may use any reasonable method to calculate the all others rate. The expected method in such cases will be to weight-average the zero and de minimis margins and margins determined pursuant to the facts available, provided volume data is available. However, if this method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods.

1994 U.S.C.C.A.N. at 4201 (emphasis added).

Respondents' antidumping duty margin arguing that

> [w]hile Commerce may have a certain amount of discretion in devising its methodologies in NME cases, the appellate court has stated that "the critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible." It is immediately apparent that Commerce's new methodology does not calculate margins as accurately as possible for the [Cooperative Respondents].

Pls.' Comments Regarding Commerce's Final Remand Determination (Dec. 16, 2002) (citation omitted) ("Pls.' Comments") at 2–3 (emphasis removed). Plaintiffs contend that Commerce's methodology was improper because

> [t]he [Cooperative Respondents'] rate is meant to represent a dumping margin that reasonably reflects the potential margin for the [Cooperative Respondents] had they been asked to submit complete sales and factors of production data. It is therefore beyond comprehension that Commerce would consider it reasonable or fair that the [Cooperative Respondents'] rate should double when the margin for every single cooperative respondent had been reduced to zero.

Id. at 3 (emphasis removed).

The United States ("Government"), on behalf of Commerce, counters that Commerce's methodology was proper because

> [t]he statute does not impose a requirement upon Commerce to examine all producers and exporters of merchandise that is subject to its investigation. Rather, the statute specifically provides for at least two methodologies to be applied to all other (i.e., non-investigated) producers and exporters. The increase in the rate for the non-selected respondents occurred because Commerce originally followed the methodology contained in 19 U.S.C. § 1677d(c)(5)(A) and, because compliance with this Court's Order of Remand resulted in margins that were either zero or based entirely

on facts available, subsequently followed the "expected method" pursuant to 19 U.S.C. § 1677d(c)(5)(B). [Plaintiffs have] not demonstrated that the 28.33 percent rate selected by Commerce is not "reasonably reflective" of the potential dumping margins of the non-selected respondents. Nor does the mere fact that the selected respondents all received margins of zero compel a finding that the potential dumping margin of the non-selected respondents must be zero.

Def.'s Resp. to Pls.' Comments Concerning the Remand Determination Filed by the United States Dep't of Commerce at 3–4 (Jan. 16, 2003) ("Def.'s Comments").

The court does not agree that Commerce's calculation of the Cooperative Respondents' antidumping duty margin in the instant investigation was proper. First, the record shows that the Cooperative Respondents fully and completely complied with all of Commerce's requests for information. Indeed, the only apparent difference between the Fully-Investigated Respondents and the Cooperative Respondents is that Commerce did not select them for full investigations. Second, while it is not inconceivable that individual margins for each Cooperative Respondent could have increased had they been fully investigated, this outcome seems unlikely given that all of the Fully-Investigated Respondents' antidumping duty margins were reduced to zero percent—including that respondent originally assigned an antidumping duty margin of 27.57 percent. See Am. Final Determination, 65 Fed. Reg. at 35,607. Given these facts it appears that Commerce strained to reach its result. This is particularly puzzling given that in reaching its result Commerce abandoned the methodology used in the Final Determination (i.e., weight-averaging the estimated dumping margins of the Fully-Investigated Respondents) even though that method is specifically provided for in the statutory subsection it purported to follow. See

Remand Determination at 14 (citing 19 U.S.C. § 1673d(c)(5)(B)).  More importantly, in doing so, Commerce failed to justify the use of its new methodology other than by reference to the SAA.  The SAA, however, takes into account the possibility that, under certain facts, the "expected" method should not be used.  See SAA, 1994 U.S.C.C.A.N. at 4201 (However, if [the "expected"] method is not feasible, or if it results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers, Commerce may use other reasonable methods.").  As the SAA indicates, when choosing a methodology for assigning antidumping duty margins Commerce cannot simply rely on a methodology found to be acceptable in other investigations.  Rather, Commerce must insure that any methodology it employs in any particular investigation "is based on the best available information and establishes antidumping margins as accurately as possible."  Shakeproof, 268 F.3d at 1382.  In addition, when selecting a methodology Commerce must "articulate a 'rational connection between the facts found and the choice made.'"  Rhodia, 25 CIT at __, 185 F. Supp. 2d at 1348.  The plain language of the statute allows Commerce the flexibility to formulate a methodology that permits it to best comply with these injunctions, and specifically allows for the averaging of the zero percent antidumping duty margins.  See 19 U.S.C. § 1673d(c)(5)(B) ("[T]he administering authority may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." (emphasis added)).  In the Remand Determination, however, Commerce nowhere explains how its choice of methodology established the Cooperative Respondents' antidumping duty margin "as accurately as possible" or makes a "rational connection between the facts found

and the choice made." <u>Shakeproof</u>, 268 F.3d at 1382; <u>Rhodia</u>, 25 CIT at __, 185 F. Supp. 2d at 1348. Thus, the court finds that, with respect to the recalculation of the Cooperative Respondents' antidumping duty margin, Commerce's determination on remand is neither based on substantial evidence nor otherwise in accordance with law.


## CONCLUSION

For the reasons set forth above, the court remands this matter to Commerce. On remand, Commerce shall revisit the issue of the proper calculation of the Cooperative Respondents' antidumping duty margin and shall either: (1) use the methodology set forth in 19 U.S.C. § 1673d(c)(5)(B); or (2) set out another methodology. In either event, Commerce shall explain in clear and specific terms why its selected methodology "is based on the best available information and establishes antidumping margins as accurately as possible." <u>Shakeproof</u>, 268 F.3 at 1382.


Such remand determination is due within 45 days of the date of this opinion, comments are due thirty days thereafter, and replies to such comments 11 days from their filing.


_____
Richard K. Eaton, Judge

Dated: March 21, 2003
      New York, New York