Note:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2006-1601

POLYETHYLENE RETAIL CARRIER BAG COMMITTEE, HILEX POLY CO., LLC,
and SUPERBAG CORPORATION,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

and

HANG LUNG PLASTIC MANUFACTORY, LTD.,

Defendant-Appellee,

and

NANTONG HUASHENG PLASTIC PRODUCTS CO.,

Defendant-Appellee.

Stephen A. Jones, King & Spalding LLP, of Washington, DC, argued for plaintiffs-appellants.  With him on the brief was Joseph W. Dorn.  Of counsel was Daniel L. Schneiderman.

Sameer Yerawadekar, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee, United States.  With him on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief were John D. McInerney, Chief Counsel, Michele D. Lynch, Senior Counsel, and Jennifer I. Johnson, Attorney, United States Department of Commerce, of Washington, DC.  Of counsel was Marisa Beth Goldstein.

Ronald M. Wisla, Garvey Schubert Barer, LLP, of Washington, DC, for defendant-appellee, Hang Lung Plastic Manufactory, Ltd.  With him on the brief was William E. Perry, of Seattle, Washington.

Adams C. Lee, White & Case LLP, of Washington, DC, for defendant appellee, Nantong Huasheng Plastic Products Co.  With him on the brief was Jay C. Campbell.  Of counsel was Joanna Ritcey-Donohue.

Appealed from:  United States Court of International Trade

Judge Judith M. Barzilay

NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2006-1601

POLYETHYLENE RETAIL CARRIER BAG COMMITTEE, HILEX POLY CO., LLC,
and SUPERBAG CORPORATION,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

and

HANG LUNG PLASTIC MANUFACTORY, LTD.,

Defendant-Appellee,

and

NANTONG HUASHENG PLASTIC PRODUCTS CO.,

Defendant-Appellee.

_____

DECIDED:  May 4, 2007

_____

Before BRYSON, <u>Circuit Judge</u>, CLEVENGER, <u>Senior Circuit Judge</u>, and LINN, <u>Circuit Judge</u>.

BRYSON, <u>Circuit Judge</u>.

This appeal concerns an antidumping investigation of polyethylene retail carrier bags ("PRCBs") from China. The appellants, the Polyethylene Retail Carrier Bag Committee and two of its members (collectively "the PRCB Committee"), sought judicial review by the Court of International Trade of certain determinations made by the Department of Commerce in connection with the investigation. Those determinations resulted in respondents Hang Lung Plastic Manufactory, Ltd., ("Hang Lung") and Nantong Huasheng Plastic Products Co. ("Nantong") not being subject to antidumping duties on imported PRCBs. The Court of International Trade upheld Commerce's determinations. No. 04-00319. We hold that those determinations were supported by substantial evidence, and we therefore <u>affirm</u> the trial court's decision.

In 2003, Commerce began an investigation into whether PRCBs were being sold at less than fair value in the United States. Hang Lung and Nantong were among the companies investigated. After completing the investigation, Commerce determined that PRCBs were being sold at less than fair value and subsequently issued an antidumping order. Because Hang Lung and Nantong received <u>de</u> <u>minimis</u> margins as a result of the investigation, they were excluded from the order. <u>See</u> 19 C.F.R. § 351.204(e).

The PRCB Committee brought this action to challenge the exclusion of Hang Lung and Nantong from the antidumping order. The Court of International Trade initially affirmed all but one of the challenged determinations by Commerce. With respect to the remaining issue, the court remanded for Commerce to provide a further explanation of the method it used to value Hang Lung's consumption of electricity in the production process. After Commerce issued a response on remand, the Court of International

Trade affirmed the agency's determination as to Hang Lung's electricity usage. The PRCB Committee then took this appeal.

I

The PRCB Committee first challenges Commerce's method of calculating the value of the electricity consumed by Hang Lung in producing plastic bags exported to the United States. Because Hang Lung did not report the actual amount of electricity used in the production of those bags, Commerce acted pursuant to 19 U.S.C. § 1677e by applying "facts otherwise available" and drawing an inference adverse to Hang Lung with respect to those facts. In particular, Commerce calculated Hang Lung's electricity consumption by allocating the value of the electricity Hang Lung used in the production of all of its exported bags to the production of those bags exported to the United States.

The PRCB Committee now argues that Commerce's verification of Hang Lung's data representing the total amount of electricity it used in producing bags was unsupported by substantial evidence. The methodology employed in this case, however, appears to be well within the discretion generally afforded to Commerce in such matters. See, e.g., Micron Tech., Inc. v. United States, 117 F.3d 1386, 1394-96 (Fed. Cir. 1997); Lasko Metal Prods., Inc. v. United States, 43 F.3d 1442, 1446 (Fed. Cir. 1994). Hang Lung presented Commerce with worksheets demonstrating how it attributed electricity usage based on meters in each of its departments. Commerce verified that the data on the worksheets matched the meter records that Hang Lung kept in the ordinary course of business. Although Commerce could not verify electricity usage on a per-unit basis, it was able to use the collected data to calculate total electricity usage. The PRCB Committee does not provide any affirmative evidence

suggesting that the total usage data should be discredited, but instead argues that Commerce has failed to meet its burden of showing that substantial evidence supports its determination. In the absence of any reason to question the reliability of the data on which Commerce relied, we conclude that the calculation of total electricity consumption is supported by substantial evidence.

In the alternative, the PRCB Committee argues that Commerce's constructed value for Hang Lung's electricity costs was not adverse to Hang Lung and therefore was inconsistent with 19 U.S.C. § 1677e. That argument is without merit. As discussed above, Commerce attributed the total cost of electricity for producing all of Hang Lung's exported bags to the production of those bags exported to the United States. Because the attributed electricity cost was greater than the actual cost of electricity used in the production of those bags, the attributed cost was clearly "adverse" to Hang Lung. The PRCB Committee argues that Commerce instead should have adopted the highest electricity usage rate reported by any respondent in the antidumping investigation, but that was not required. Commerce has broad discretion in choosing which facts to rely on in applying an adverse inference. See, e.g., F. Lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000). Moreover, the application of adverse inferences is not intended to be punitive; rather, Congress "intended for an adverse facts available rate to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance." Id. Commerce complied with that standard, and for that reason we find that Commerce's calculation of the cost of Hang Lung's electricity usage is "adverse" within the meaning of 19 U.S.C. § 1677e.

II

The PRCB Committee next argues that Commerce improperly accepted Nantong's reported purchase price for polyethylene resin, which is one of the primary raw materials used to make PRCBs. To value factors of production in non-market economies, Commerce generally relies on the actual prices paid for materials if the materials are purchased from a market economy supplier and paid for in a market economy currency. See 19 C.F.R. § 351.408(c)(1). However, Commerce does not use actual prices if it finds that those prices are distorted or otherwise not market-determined. See Antidumping Duties; Countervailing Duties; Final Rule, 62 Fed. Reg. 27296, 27366 (May 19, 1997); see also Shakeproof Assembly Components v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001). In this case, Commerce accepted Nantong's reported purchase price for resin. There is no dispute that Nantong purchased its resin from a market economy supplier and paid for the resin in a market economy currency. The PRCB Committee argues, however, that the resin prices reported by Nantong were not actually market-determined prices.

Among the respondents in the antidumping investigation, Nantong reported paying the lowest price per kilogram for both high-density and low-density resin. That difference could not fairly be attributed to bulk purchasing, as Nantong paid less per kilogram than even those companies that purchased greater amounts of resin. The prices reported by Nantong were also lower than those reported on commodity exchanges. Furthermore, Nantong's resin supplier was also a downstream customer, and Nantong gave that supplier preferential pricing on its purchases of Nantong's products. Based on those facts, the PRCB Committee argues that the prices paid by

Nantong were not arms-length, market-determined prices, and therefore should not have been used by Commerce to calculate dumping margins.

Commerce investigated whether Nantong's reported prices for resin were market determined. In response to Commerce's inquiry, Nantong stated that it was able to secure low resin prices due to its longstanding relationship with its supplier and because the contracts were subject to certain minimum purchase requirements. Nantong also explained that it negotiated the prices in those contracts based on market prices from a particular market research website. Commerce reviewed the contracts, invoices, and website data for the period of investigation, as well as earlier and later periods, and found no discrepancies. Commerce also found that during the period of investigation, Nantong was phasing out its discounted sales to its supplier and was replacing them with full-price sales directly to the supplier's third-party customer (effectively competing with the supplier for the third-party customer's business). Based on its investigation, Commerce concluded that Nantong and its supplier were not affiliated or in collusion, and that the prices paid by Nantong for resin were market-determined prices. Even assuming the same evidence might have permitted Commerce to reach the opposite conclusion, "the possibility of drawing two inconsistent conclusions from the same evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 619-20 (1966)). In light of the thoroughness of Commerce's investigation and the reasonableness of its methodology, we conclude that Commerce's determination is supported by substantial evidence.

The PRCB Committee next challenges Commerce's decision to accept Nantong's method of reporting its factors of production. During the period of investigation, Nantong produced two types of polyethylene bags. Both were made with a mixture of high-density and low-density resin, but one type of bag had a higher percentage of high-density resin, while the other had a higher percentage of low-density resin. Nantong did not report its factors of production on a product-specific basis but instead used a more generalized methodology: It reported the total consumption of raw materials and the total production of finished goods for the period of investigation, and it allocated its resin use for each product based on average ratios. Commerce accepted that methodology and calculated Nantong's dumping margins accordingly. The PRCB Committee argues that by relying on those generalized figures, Commerce did not use the "best available information," contrary to 19 U.S.C. § 1677b(c)(1).

Commerce generally prefers to calculate factors of production on a product-specific basis, and it preliminarily determined not to rely on Nantong's reported data. However, Nantong demonstrated to Commerce that the records it kept in the normal course of its business reflected the total monthly consumption of raw materials and the average ratio of resin in the finished products. Commerce concluded that Nantong's allocation methodology was reasonable and that it did not prevent Commerce from calculating an accurate dumping margin.

The PRCB Committee points out that Nantong had production order slips that reflected, for individual product lines, specific recipes of polyethylene resin (i.e., percentages of high-density and low-density resin). It argues that Commerce should

have relied on those slips in calculating the quantities of raw materials used in the production process. However, Nantong advised Commerce that those recipes were inaccurate and distortive because they did not reflect the presence of recycled scrap in the finished product. Commerce observed the mixing process, reviewed Nantong's records, and verified from production managers that recycled scrap generally constituted 10 to 20 percent of the finished product and at times constituted as much as 50 percent. Commerce also verified that the average ratios reported by Nantong were the same ratios that Nantong reported to Chinese customs officials. Although the PRCB Committee contends that the use of those average ratios was improper, it is in effect asking this court to reweigh Commerce's determination that the production slips were less accurate than the generalized calculations. In light of the broad discretion Commerce enjoys in valuing factors of production, see Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999), we decline that invitation and hold that Commerce permissibly accepted Nantong's valuation methodology.

The PRCB Committee also criticizes Commerce's determination on the ground that Nantong reported using only five raw materials while other respondents reported using between 15 and 29 raw materials. Nantong explained that discrepancy by noting that it produced only two types of bags, both lower-end bags, whereas the other respondents produced a wider range of bags, including higher-end bags that generally required a greater number of raw inputs than lower-end items. Commerce verified Nantong's factors of production by touring the company's warehouse and storage room, viewing the mixing of raw materials and the processing of bags, interviewing various employees, and auditing the company's production orders, worksheets, and financial

statements. The PRCB Committee points to nothing in the record to suggest Nantong used any material inputs other than the five reported raw materials. We conclude that Commerce's determination is supported by substantial evidence.

IV

Next, the PRCB Committee challenges Commerce's acceptance of Nantong's methodology for allocating its consumption of ink. As in the case of the resin and other raw materials, Nantong reported that it did not record its ink consumption on a product-specific basis, but instead allocated it by dividing its total ink consumption during the period of investigation by its total production of bags during that period. Commerce verified the accuracy of the total consumption figure by inspecting the inventory slips, inventory ledgers, warehouse ledgers, and general ledgers for three randomly selected months, and found no discrepancies. The ledgers also confirmed that Nantong did not record its ink consumption on a product-specific basis.

The PRCB Committee argues that Nantong's allocation methodology was distortive because it valued ink consumption uniformly across all of Nantong's bags, even though different lines of bags varied with regard to image size and number of colors of ink. Commerce, however, stated that it "reviewed numerous different types of t-shirt bags during verification and found that the size of the bag and the number of colors are not necessarily an accurate indicator of ink consumption." Although that result may be counter-intuitive, we cannot say, on that basis alone, that Commerce's finding is unsupported by substantial evidence. Moreover, just as in the case of Nantong's other factors of production, Commerce's determination appears to reflect a reasonable approximation in light of Nantong's actual record-keeping.

Finally, the PRCB Committee challenges Commerce's valuation of cardboard used by various respondents, including Hang Lung, as inserts in the PRCBs. Commerce valued that cardboard by looking to Indian import data with respect to similar products.

The respondents reported that they used two types of cardboard, treated and untreated, and that the treated inserts are "higher quality cardboard that can be used for graphic purposes." That cardboard, according to the respondents, is classified under subheading 4810.29.00 of the Harmonized Tariff Schedule. The PRCB Committee argued that the treated inserts should have been classified as inserts "not suitable for printing" and that HTS subheading 4810.39.09 should have been used as the basis for calculating a surrogate value for the treated cardboard inserts. Commerce concluded that there was no evidence to support the PRCB Committee's contention that the respondents' representation as to the type of treated cardboard inserts they used was "illogical," and it selected the products in HTS subheading 4810.29.00 as the class of goods to use in calculating the surrogate value for the treated cardboard inserts.

The PRCB Committee argues that the respondents initially reported using low-grade cardboard inserts and then later changed their position, without substantiation, to claim that the inserts were actually of the "suitable for printing" grade. The record does not support that assertion. The initial report cited by the PRCB Committee was submitted by a single respondent, Rally. While that report stated that Rally used low-grade cardboard as inserts, it did not address the type of cardboard inserts used by other respondents. The second report cited by the PRCB Committee was submitted by

several respondents (including Rally), and it stated that some of those respondents used the higher-grade treated cardboard as inserts while others used the low-grade untreated cardboard as inserts. Contrary to the PRCB Committee's suggestion, the second report does not contradict the first report by indicating that all of the respondents used the higher-quality treated cardboard as inserts, nor does it reveal any error in Commerce's classification of the treated inserts.

The PRCB Committee also argues that the inserts are used solely for support and that they serve that purpose regardless of whether they are suitable for printing. For that reason, the PRCB Committee contends that it can be inferred that the respondents are wrong in claiming that they used cardboard inserts that are suitable for printing. The PRCB Committee offers no affirmative proof of misrepresentation, but it argues that the inference it draws is logical and that the respondents must have simply "cherry picked" an HTS classification with a lower surrogate value.

Commerce was not required to accept the Committee's proposed inference in the face of the respondents' representation as to the nature of the materials they used for their cardboard inserts. As the trial court explained, "Commerce chose one among several HTS categories to value treated cardboard inserts, and the respondents' submission supported that choice." In light of the respondents' representations as to the nature of their treated inserts and the absence of any evidence to the contrary, we hold that Commerce's determination was supported by substantial evidence.

Because we reject each of the PRCB Committee's challenges to Commerce's underlying determinations, we affirm the decision of the Court of International Trade.