**Slip Op. 08-62**

# UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

Husteel Company, Ltd. and SeAH Steel
Corporation, Ltd.,

        Plaintiffs,

    v.

United States,

        Defendant,

    and

IPSCO Tubulars, Inc., Lone Star Steel
Company, Inc., and Maverick Tube
Corporation,

        Defendant-Intervenors.

</td><td>

**Before: Gregory W. Carman, Judge**

Court No. 06-00075

</td></tr>
</table>

[*Commerce's final remand results are remanded for further consideration; Plaintiffs' motion for oral argument denied.*]

Troutman Sanders LLP (Donald B. Cameron, Julie C. Mendoza, Jeffrey S. Grimson, R. Will Planert, and Brady W. Mills) for Plaintiffs.

Gregory G. Katsas, Acting Assistant Attorney General; Jeanne E. Davidson, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (David D'Alessandris), and David W. Richardson, of counsel, Office of Chief Counsel for Import Administration, United States Department of Commerce, for Defendant.

Schagrin Associates (Roger B. Schagrin and Michael J. Brown) for Defendant-Intervenors.

June 2, 2008

## OPINION & ORDER

CARMAN, JUDGE: This case returns to the Court following a remand to the United States Department of Commerce pursuant to the Court's order in Husteel Co., Ltd. v. United States, 31 CIT __, __, 491 F. Supp. 2d 1283, 1296 (2007) (remanding Oil Country Tubular Goods, Other Than Drill Pipe, from Korea, 71 Fed. Reg. 13,091 (Dep't Commerce Mar., 14, 2006) and associated Issues & Decision Mem.) ("Husteel I"). Plaintiffs, Husteel Company, Ltd. and SeAH Steel Corporation, Ltd. (together, "Respondents"), challenge the results of Commerce's remand, in which Commerce continues to exclude certain of Respondents' sales from the calculation of normal value. See Results of Redetermination on Remand Pursuant to Husteel Co., Ltd. & SeAH Steel Corp., Ltd. v. United States ("Remand Results"). Because Commerce's Remand Results suffer from the same shortcomings as the original results that they were intended to rectify, the Court remands the Remand Results for further consideration.

## BACKGROUND

Respondents, who are Korean producers of Oil Country Tubular Goods ("OCTG"), participated in the ninth administrative review of the antidumping order on OCTG from Korea, covering the 2003-2004 period of review. In the final results to the administrative review, Commerce excluded certain of Respondents' sales from the

calculation of their respective normal values.  The sales that Commerce excluded were made by each Respondent to independent trading companies located in Korea, who in turn resold the merchandise to buyers located in the People's Republic of China ("China" or "PRC"), a nonmarket economy.  At the time Respondents negotiated these sales with the trading companies, Respondents knew that the trading companies intended to resell the merchandise to buyers located in China.  As a result, Respondents classified these sales as sales to China when they reported them to Commerce.  Respondents' characterization of these sales as Chinese was correct and is not at issue in this case.

What is at issue is Commerce's exclusion of the sales from the calculation of Respondents' normal values.[1]  In the final results of the administrative review,

---

[1]To calculate normal value, Commerce first looks to the home-market price of the merchandise.  Where, as here, there is no viable home market, Commerce uses the sales price from the respondent to a third-country.  If there are multiple viable third-country markets, Commerce will select the third-country where the greatest amount of merchandise was sold that is most similar to that sold to the United States.  If there are no viable third-country markets, Commerce will use a constructed normal value.  19 U.S.C. § 1677b(a)(1), (a)(4) (2000).

Here, China was the largest third-country market for both Respondents.  In fact, China was the only potentially viable third-country market for Respondent Husteel.  After excluding sales to China, Commerce calculated Husteel's normal value using a constructed normal value, and, for Respondent SeAH, Commerce used the third-country market with the next-largest volume of sales, Canada.  If China's sales had not been excluded, Commerce would have calculated Husteel's normal value using China as the third-country comparison market.  For SeAH, however, Commerce would have needed to determine whether the merchandise sold to China or Canada was more

(continued...)

Commerce excluded the sales on the grounds that the prices for the sales may not be "representative," a statutory requirement for inclusion. See 19 U.S.C. § 1677b(a)(1)(B)(ii)(I) (2000). In the Court's first decision in this matter, the Court affirmed that Commerce's interpretation of representative as meaning, "determined on the basis of market principles" was permissible. Husteel I, 31 CIT at __, 491 F. Supp. 2d at 1290. Yet, the Court held that Commerce failed to adequately explain and support with substantial evidence on the record its decision to exclude Respondents' sales as being unrepresentative. Id. at 1293.

Commerce's explanation for excluding these sales rested on two assumptions: (1) that domestic prices in an nonmarket economy are not determined on the basis of market principles; and (2) that foreign suppliers to nonmarket economies compete with domestically-set prices. Based on these assumptions, Commerce concluded that sales from a market-economy seller to a buyer located in a nonmarket economy "may very well not be at prices that reflect the fair value of the merchandise." Issues & Decision Mem. for the Final Results of the Admin. Rev. on OCTG from Korea 8 (Dept' Commerce Mar. 7, 2006).

---

[1](...continued)
similar to that sold to the United States to determine which third-country market would be used for this calculation.

The Court identified two problems with Commerce's explanation. First, the Court questioned why Commerce treated Respondents' sales as sales into a nonmarket economy. Husteel I, 31 CIT at __, 491 F. Supp. 2d at 1291. Respondents sold OCTG to independent trading companies located in Korea; the trading companies then resold the merchandise to buyers located in China. The price data Respondents wanted to use was from the sales between Respondents and the Korean trading companies. Though it was correct to refer to the sales as Chinese as a matter of characterization, Commerce failed to explain why it was applying presumptions about conditions of sale in nonmarket economies to an arm's-length sale between two independent entities both operating in a market economy—facts which had been separately verified by Commerce.

The second problem the Court identified centered around Commerce's assumption that foreign suppliers to nonmarket economies compete with domestically-set prices in the nonmarket economy, and therefore sell merchandise at distorted, nonmarket prices. Commerce's assumption in this case appeared to contradict the agency's position in a related line of antidumping duty investigations, where the producer being investigated for dumping is itself located in a nonmarket economy (referred to here as "NME-Producer cases"). In NME-Producer cases, Commerce regularly accepts sales price data from a market-economy supplier to a nonmarket-economy buyer (the respondent in those cases) to calculate normal value, see 19 C.F.R.

§ 351.408(c)(1) (2007), and Commerce did not give a persuasive explanation for why

Respondents here should be treated differently.

On remand, Commerce attempted to address the Court's concerns. Regarding

the question of why Commerce treated Respondents' sales as though they were made to

nonmarket buyers, Commerce explained that knowledge of the trading companies'

intent to resell the merchandise to buyers in China influenced the price at which

Respondents sold the merchandise to the trading companies. "Because Plaintiffs had

knowledge of the destination country, Plaintiffs . . . priced the OCTG sold to the trading

companies based on the conditions in the PRC." (Remand Results 17.)

Regarding the question of why Commerce did not accept Respondents' Chinese

sales data to calculate normal value when it regularly does so in NME-Producer cases,

Commerce offered a two-fold response. The primary answer rehashed an argument

that the Court rejected in the first decision: that the two situations are not analogous

because different standards apply to the admissibility of evidence in the two types of

cases. The second answer was that even if the two situations are analogous, Commerce

does not accept sales price data if those sales might be distorted (i.e., dumped or

subsidized). Commerce stated that it has reason to believe that Respondents'

merchandise may have been subsidized, with the implication being that Commerce

need not use the price data from their Chinese sales to calculate normal value.  (Remand

Results 7.)

Commerce also presented evidence on two subjects to support the determination

that Respondents' sales where not "representative": (1) data on average prices for

Chinese OCTG as compared to average world prices for OCTG; and (2) analysis of the

Chinese oil and gas industry, the sector of the Chinese economy that uses OCTG.

In the results to the remand, Commerce continued to conclude that Respondents'

sales were not representative, and therefore did not recalculate Respondents' normal

values or dumping margins.  Respondents argue that Commerce did not comply with

the Court's remand order and that Commerce's Remand Results are not supported by

substantial evidence; Commerce and Defendant-Intervenors contend that the agency

did so comply and that the Remand Results are in accordance with the Court's order.

## STANDARD OF REVIEW

The Court reviews Commerce's Remand Results under the substantial evidence

test.  19 U.S.C. § 1516a(b)(1)(B)(i) (2000) ("The court shall hold unlawful any

determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law.").

DISCUSSION

I.    **Commerce may not presume that sales made from market-economy sellers to buyers located in nonmarket-economies are made at distorted, nonmarket prices.**

The first question raised by this case is whether Commerce can assume that when a buyer located in a nonmarket economy purchases merchandise from a seller located in a market economy, the sales are made at distorted, nonmarket prices. The answer is that Commerce may not.

A.    **Commerce's Presumption is Inconsistent With Its Practice in NME-Producer Cases.**

As discussed in the Court's first opinion, in NME-Producer cases, Commerce "regularly calculates normal value using price data from sales between market-economy sellers and nonmarket-economy buyers." Husteel I, 31 CIT at __, 491 F. Supp. 2d. at 1293. Commerce regulations state that "where a factor is purchased from a market economy supplier and paid for in a market economy currency, the Secretary normally will use the price paid to the market economy supplier" to calculate normal value for the nonmarket-economy buyer (the respondent). 19 C.F.R. § 351.408(c)(1) (2007). The Court of Appeals for the Federal Circuit affirmed this practice. Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001) ("accuracy, fairness, and predictability are enhanced by using" the sales price) (citation omitted).

Here, however, Commerce excluded similar data submitted by Respondents.[2]

Commerce argues that there are valid reasons to treat the sales price data submitted by

Respondents differently than that submitted in NME-Producer cases. First, Commerce

argues that data must meet a higher standard to be used in this case than is required to

be used in NME-Producer cases. (Remand Results 9.) Second, Commerce argues that

Respondents' sales price data would be excluded under rules applying to NME-

Producer cases, because Commerce suspected that Respondents' prices might be

---

[2]As mentioned above, Respondents did not directly sell to buyers located in China; they sold to Korean trading companies who resold the OCTG to Chinese buyers. Commerce argues that Respondents' sales are different from an ordinary sale between two market participants because Respondents knew, at the time they negotiated their sales, that the trading companies intended to resell the merchandise to China. Commerce argues that because of that knowledge, the market conditions in China are relevant to Respondents' sales, and cite as support the "knowledge test" developed by the agency. (Remand Results 4.)

The "knowledge test" is used where a producer sells to a middleman who in turn resells to a purchaser in the United States, and states that Commerce will use the price between the producer and unrelated middleman as purchase price, if the producer knew that the merchandise was intended for sale to an unrelated buyer in the United States. Commerce argues that the knowledge test "hinges on the belief that a producer . . . might sell at a lower price if it knows that the merchandise is to be exported than if the merchandise is intended for domestic consumption." (Id.)

The Court first notes that Respondents propose using the price from them (the producer) to the trading companies (the middlemen), which is consistent with the "knowledge test." Insofar as Commerce argues that the price Respondents negotiated with the trading companies was distorted by virtue of their knowledge, the Court does not find that the "knowledge test" supports that conclusion, and rejects the argument for the reasons stated in Section I of the Discussion.

distorted due to broadly available export subsidies in Korea.  (Remand Results 7 n.9, 28-29.)  Each point will be refuted below.

    1.       **"Representative" Data v. "Best Available Information"**

The first point Commerce raises is that Respondents should be treated differently because, for their sales price data to be used, they need to be "representative," while data in NME-Producer cases need only be the "best available information."  (Remand Results 9; Def.'s Resp. 9.)  Commerce explains that it is reasonable to apply different standards to the data because in NME-Producer cases the data are used to value "a single input used in the calculation of normal value," whereas here the data are "used as the entire basis for normal value."[3]  (Remand Results 9.)

Commerce is correct that the statute governing use of sales price data in the two types of cases use different words, "representative" in this case and "best available information" in NME-Producer cases.  Compare 19 U.S.C. § 1677b(a)(1)(B)(ii)(I), with 19 U.S.C. § 1677b(c)(1).  Yet, the argument misses the crux of the problem identified by the Court in the first opinion, which was that Commerce's inconsistent treatment rests on two incompatible views of how the world works.

---

[3]In the first opinion, the Court rejected as "a distinction without a difference," Commerce's claim that the two types of cases should be treated differently because the data is used to value a single input in NME-Producer cases but the entirety of normal value here.  Husteel I, 31 CIT at __, 491 F. Supp. 2d at 1294.  The Court is not persuaded by Commerce's repetition of this argument.

On the one hand, in the NME-Producer methodology, Commerce implicitly acknowledges that there are at least some instances where a buyer located in a nonmarket economy purchases merchandise from a market-economy seller at a market price. We know this to be true because Commerce may not use data that is distorted, and must verify that the purchases are "arm's-length, <u>bona</u> <u>fide</u> sales." (<u>See</u> <u>Remand</u> <u>Results</u> 9 (<u>citing</u> <u>Shakeproof</u>, 268 F.3d at 1382).) Accordingly, Commerce must acknowledge that in those instances, the nonmarket-economy buyer cannot, merely by virtue of being located in a nonmarket economy, dictate the price it will pay based on the domestic price of the merchandise inside the nonmarket economy. In fact, the domestic economic conditions are irrelevant to such a transaction. Instead, the nonmarket-economy buyer must pay the price the merchandise fetches on the world market.[4]

On the other hand, in this case Commerce presumed that the entire chain of transactions between Respondents, the trading companies, and the ultimate Chinese buyers was somehow tainted by the domestic economic conditions in China. As

---

[4]Respondents apply a similar reasoning to the facts of this case:
[M]arket economy participants like Plaintiffs and their unrelated trading company customers are not required to sell into the PRC. If the price they could receive from a customer in the PRC was artificially low (i.e., not based on market principles) due to PRC government policies, they could just make the decision to sell to other markets or make no sales at all.
(Pl. Br. 22.)

Commerce explained it, "sales of any product are directly impacted by conditions in the country into which it is sold. There is no viable domestic market for OCTG in Korea." (Remand Results 2..) "As such, price conditions in the PRC impacted the prices that Plaintiffs ultimately negotiated for these sales." (Id. at 5.)

Setting aside the problem of Commerce glossing over the fact that Respondents actually sold their merchandise to unrelated trading companies located in Korea—a market economy[5]—Commerce never considers the possibility that this could be one of those situations where a nonmarket-economy buyer purchases the subject merchandise at the world, or market, price. Given this possibility, it does not make sense for Commerce to start from the presumption that the Chinese buyers dictated a distorted, nonmarket price to Respondents. As a result, the Court will not allow Commerce to exclude Respondents' sales price data as unrepresentative without presenting evidence to support that conclusion.

In Section II of the Discussion, the Court evaluates the evidence cited by Commerce, and concludes that Commerce's determination that Respondents' sales are

---

[5]Commerce attempts to negate the significance of the sale between Respondents and the trading companies by stating in a conclusory fashion: "Since the OCTG at issue was sold for consumption in the PRC, the trading companies necessarily acted as the representatives of their PRC customers. . . . Under the facts of this case, the trading companies are a conduit, not an end customer." (Remand Results 6.)

not representative is not supported by substantial evidence on the record. But first, the

Court addresses a red herring argument made by Commerce regarding subsidies.

    **2.**     **Commerce's Suspicion that Korea Provides Export Subsidies is Not a Valid Reason to Exclude Respondents' Sales.**

A secondary reason that Commerce provides for not accepting Respondents'

sales price data is that they might be distorted due to the availability of subsidies in

Korea. Sales will be excluded from the calculation of normal value in NME-Producer

cases if Commerce has reason to believe the sales were subsidized. The agency states

here that it has "found in other proceedings that South Korea maintains broadly

available, non-industry-specific export subsidies and, therefore, it is reasonable to infer

that all exports to all markets from South Korea may be subsidized." (Remand Results

7 n.9.) Although Commerce does not explicitly state as much, the implication is that it

was justified in excluding the sales.

However, the Court has reason to doubt Commerce's suspicion. If Commerce

was truly concerned that the price of Respondents' sales was distorted as a result of

export subsidies, this concern would not be export-country specific. Based on

Commerce's description, South Korea's export subsidy programs do not appear to be

limited to certain export countries. (See id.) Under such a premise, Commerce would

not be able to use price data for subsidized sales, regardless of export-country. See 19

U.S.C. §1677b(b). Yet, Commerce used data from Respondent SeAH's sales to Canada

without noting a concern that those sales were subsidized.  As a result, the Court wonders if subsidization is truly such a concern here.

Furthermore, as a factual matter, it is unclear to the Court that Respondents were eligible for export subsidies for the relevant sales because it was the unrelated trading companies who exported the OCTG to China, not Respondents.  On the record as it stands, there is not sufficient evidence to affirm Commerce's implied determination that Respondents' sales were subsidized.  The Court now turns to the evidence Commerce presented to support its determination that Respondents' sales were not representative.

II.    **Commerce's Evidence Does Not Support the Conclusion that Respondents' Sales are Not Representative.**

Commerce presents evidence on two subjects as support for its determination that Respondents' sales are not representative: (1) average price data for imports of OCTG into China as compared to the rest of the world; and (2) analysis of the Chinese oil and gas industry, the sector of the economy that uses OCTG imports.  Because of problems with the evidence presented, the Court holds that Commerce's determination that Respondents' sales are not representative is unsupported by substantial evidence on the record.

A.    The OCTG Price Data is Not Detailed Enough to Support Commerce's Conclusion.

Commerce presents empirical evidence that the price of OCTG sold to China is less than the price of OCTG sold to the rest of the world. Specifically, Commerce presents two graphs, one comparing "average OCTG import prices into the PRC in 2003 and 2004 [the period of review spans those two years] and average OCTG import prices into the rest of the world for the same period." (Remand Results 11.) In the second graph, Commerce compares "Korean OCTG export prices to the PRC and Korea's export prices to the rest of the world" during the same period. (Id.) Commerce indicates that the prices in both comparisons are "significantly different" and concludes that "the PRC prices are not representative of the prices found in the rest of the world." (Id. at 11, 33.)

The Court does not find there to be sufficient evidence contained in the Remand Results to evaluate Commerce's conclusion. The primary problem with the data is that Commerce has included only average world price as a comparison to Chinese price. With a world average, the distribution of prices across countries is hidden. As a result, the Court cannot evaluate whether Chinese OCTG prices are "significantly different" than those in the rest of the world. For example, the distribution of country-prices

might cluster around the Chinese price, but a single, large outlier would result in the average world price appearing "significantly different."[6]

The second issue with the data is that the mere fact that the prices are different is not in and of itself legally significant. Commerce does not indicate that the agency generally suspects the validity of a sale merely because the price for it differs from average world price. The difference in prices matters here because Commerce argues that it shows that the Chinese government is setting the price of OCTG inside China, and the distorted domestic price in China led Respondents to sell OCTG for export to China at distorted, nonmarket prices. However, Respondents raised a persuasive argument that the average price data relied on by Commerce actually undermines the agency's claim.

Respondents claimed that "the data shows significant variation in [average prices] for all source countries for OCTG into the PRC, and this should not happen if, as Commerce alleges, prices for OCTG are set by the government." (Remand Results 32 (Commerce summarizing Respondents' argument).) Commerce responded that it

---

[6]A numerical illustration might be helpful. Imagine that there are 5 countries included in the world average. The Chinese price is $100, and in 4 of the other 5 countries, the price is also $100. In the fifth country, the price is $1600. Average world (minus China) price would be $400 ((100 + 100 + 100 + 100 + 1600 = 2000) / 5 = 400). In this example, a comparison of Chinese price to average world price ($100/$400) would mislead, because it would hide the fact that 4 of the 5 countries had the same price as China.

"expects this type of variation to be found for all of the countries that collect this type of data." (Id.) But why? If the nonmarket economy government sets the price, why would it differ from export country to export country? To explain the variation, Commerce relies on the very market considerations (volume of sales, specific grade of merchandise, etc.) that it argues are not present in sales to a nonmarket-economy buyer.[7] Commerce has not adequately dealt with the objection to the average price data raised by Respondents.

On remand, Commerce should (a) compare Chinese price to individual country prices of OCTG to determine whether the prices are "significantly different," and (b) meaningfully address Respondents' objections to the average price data.

**B.      The Evidence Regarding Government Control Over the Oil and Gas Industry in China is Irrelevant.**

Commerce also presents evidence that the sector that uses OCTG in China, the oil and gas industry, is owned and controlled by the Chinese government. (Remand Results 10-11, Attach. 1.) Commerce believes that the Chinese government's control of the oil and gas industry necessarily means that the prices for Respondents' sales are not

---

[7]Respondents also argued that prices in China were sometimes lower (like in 2003 and 2004) and sometimes higher (2005 and 2006) than average world price, which also should not happen if Chinese buyers were able to dictate nonmarket prices to market-economy sellers. (See Pl. Br. 25.)

based on market conditions.  The Court disagrees.  The Chinese government's control of

the oil and gas industry, within China, does not inform on whether Respondents sold

OCTG at representative prices.  As Respondents explain:

> Even assuming that the PRC government has complete control over the oil
> and gas sector in China and sets the prices for the sale of oil and gas in
> China, this begs the question as to how this PRC government control of
> the oil and gas sector <u>within China</u> impacts the pricing decisions of market
> economy companies <u>outside of China</u> making steel products.

(Pl. Br. 21.)  The relevant question is not whether the Chinese government controls the

oil and gas industry within China, but whether its control over the oil and gas industry

means that Chinese buyers of OCTG can dictate distorted, nonmarket prices to

Respondents.  And it is not enough to conclude that this is so; this is the issue on which

Commerce must present evidence.

Because the evidence presented by Commerce does not show what Commerce

purports it does, the Court cannot affirm Commerce's determination that Respondents'

sales are not representative.  If Commerce has persuasive evidence that the sales are not

representative, it should be presented on remand.  If Commerce does not, it may not

exclude Respondents' sales on that basis.[8]

---

[8]Although not addressed on remand, the Court notes that if Commerce
determines that Respondents' sales for export to China are representative, the agency
has the additional task of selecting among China and Canada as Respondent SeAH's
third-country market to calculate normal value.  Therefore, Commerce should evaluate
the factors listed in 19 C.F.R. § 351.404(e) to determine which third-country market

(continued...)

CONCLUSION

Because Commerce's Remand Results are not supported by substantial evidence on the record, the Court remands the Remand Results to Commerce for further consideration. Upon consideration of the papers submitted by all parties, and upon due deliberation, it is hereby

**ORDERED** that Respondents' motion for oral argument is denied; and it is further

**ORDERED** that this case is remanded to Commerce for the agency to present persuasive evidence, if there is any, that Respondents' sales for export to the China are not "representative" within the meaning of 19 U.S.C. § 1677b(a)(1)(B)(ii)(I) (2000); and it is further

**ORDERED** that if Commerce cannot present persuasive evidence that Respondents' sales are not representative, Commerce will determine that the sales are representative; and it is further

**ORDERED** that if Commerce determines that the sales are representative, Commerce will determine pursuant to 19 C.F.R. § 351.404(e) whether China or Canada should be selected as SeAH Steel Corp., Ltd.'s third-country comparison market; and it is further

**ORDERED** that if Commerce determines that China should be used as the third-country comparison market, Commerce will recalculate Respondents' dumping margins accordingly; and it is further

---

[8](...continued)
should be used if both are determined to be representative.

      **ORDERED** that the remand results shall be filed no later than September 2, 2008; that Respondents may file papers with the Court indicating whether they are satisfied or dissatisfied with the remand results no later than October 15, 2008; that Defendant and Defendant-Intervenors may respond to Respondents' comments no later than November 19, 2008; and that Respondents may reply to the responses no later than December 10, 2008.


                        __/s/_Gregory_W._Carman__
                              Gregory W. Carman


Dated: June 2, 2008
      New York, New York